IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CONSTANCE LYTTLE, individually and on behalf)
of the UNITED STATES OF AMERICA, and the    )
UNITED STATES OF AMERICA,                    )
              Plaintiffs,                     )
                               )
        vs.                                  )       Civil Action No. 2:10-1376
                               )       Judge Fischer
AT&T CORPORATION, also known as AT&T        )       Magistrate Judge Mitchell
ACCESSIBLE COMMUNICATIONS SERVICES, )
              Defendant.                      )


REPORT AND RECOMMENDATION

I.     Recommendation

       It is respectfully recommended that Defendant AT&T's Motion to Dismiss the Complaint

in Intervention of the United States (ECF No. 44) be denied.  It is further recommended that

Defendant AT&T's Motion to Dismiss the Amended Complaint of Plaintiff/Relator (ECF No.

47) be granted with respect to Counts II, III, IV, V, VI and VII and denied with respect to Count

I, which is limited to the period between May 20, 2009 and October 31, 2009.

II.    Report

       Plaintiff-Relator, Constance Lyttle (Relator), brings this action individually and as relator

on behalf of the United States of America against Defendant, AT&T Corporation, also known as

AT&T Accessible Communications Services (AT&T), alleging that Defendant violated the False

Claims Act, 31 U.S.C. §§ 3729-33 (the FCA), beginning in 2002 by submitting false requests for

reimbursement for a telecommunications relay service known as Internet Protocol Relay that it

provides to individuals with hearing and/or speech impairments in the United States.  The

requests are alleged to be false because they were for calls that originated outside the United

States and/or were placed by callers without a hearing impairment. After an initial period when the case was under seal, Relator filed a First Amended Complaint ("FAC")[1] on March 21, 2012, alleging five claims arising under the FCA, plus two related state-law claims. Upon review, the United States filed a notice of its election to intervene in part and to decline to intervene in part (ECF No. 20) and filed a Complaint in Intervention ("U.S. Compl.")[2] on March 21, 2012 making similar FCA claims, but referring to a more recent time period than that alleged by Relator.

Currently pending for disposition are two motions to dismiss filed by Defendant: a motion to dismiss the Relator's FAC and a motion to dismiss the United States' Complaint in Intervention. For the reasons that follow, the motion to dismiss the Complaint in Intervention should be denied and the motion to dismiss the First Amended Complaint should be granted in part and denied in part.

Facts

This case involves AT&T's provision of a telecommunications relay service ("TRS") known as Internet Protocol Relay Service ("IP Relay"). In all TRS services, a "Communications Assistant" ("CA") receives typed or signed messages from a person with a speech or hearing disability and then orally relays the message to the other person on the call (and vice versa). (U.S. Compl. ¶ 7.) See 47 U.S.C. § 225(a)(3); 47 C.F.R. § 64.601(a)(22). The Federal Communications Commission (FCC) implemented TRS in 1991 and in 2002, the FCC authorized the use of IP Relay, in which deaf or speech-impaired persons communicate with CAs via a computer over the Internet. (FAC ¶¶ 30-31; U.S. Compl. ¶ 8.) See 47 C.F.R. § 64.601(a)(13).[3]

---

[1] ECF No. 31.
[2] ECF No. 29.
[3] Video Relay Service (VRS), which is referenced frequently in this case, is another TRS service

Title IV of the Americans With Disabilities Act of 1990 (ADA) requires the FCC to "ensure" that TRS services that are "functionally equivalent" to ordinary voice communications services are made available to deaf and speech-impaired persons in the United States "to the extent possible and in the most efficient manner." 47 U.S.C. § 225(a)(3), § 225(b)(1); 47 C.F.R. § 64.601(a)(22). The FCC is required to adopt regulations that implement this requirement by prohibiting TRS providers from "refusing calls," "limiting the length of calls," "disclosing the content of any relayed conversation regardless of content," or "intentionally altering a relayed conversation." 47 U.S. § 225(d)(1)(E), (G); 47 C.F.R. § 64.604(a)(2-3). (U.S. Compl. ¶ 9; FAC ¶¶ 28, 36.)[4]

Defendant argues that, when IP Relay was introduced (and today), the service provider received (at most) the Internet Address of the caller's computer, and because "Internet Addresses do not have geographical correlates," IP Relay providers did not know the location of the caller. Improved TRS, 17 FCC Rcd. 7779, 7784 ¶ 15 (2002); see TRS, 19 FCC Rcd. 12475, 12495 ¶ 37 (2004). Relator contends that AT&T has filed patents for software to detect and block the use of proxy servers, which are used to mask an international user's physical location, and that it could have installed and used such software to reduce fraudulent calls, but that it deliberately chose not to do so. (FAC ¶¶ 94, 96-97, 102-03.)

Under the FCC's regulations, users of IP Relay are not charged for the service. Rather, in accordance with Section 225 and implementing FCC regulations, IP Relay providers recover

---

that allows people with hearing or speech disabilities to use sign language to communicate by signing to a CA over a video link and the CA conveys the conversation to the voice caller. The FCC approved VRS in 2000. 47 C.F.R. § 64.601(a)(27).

[4] Plaintiffs cite the qualifying clause in the regulation that it applies "to the extent that it is not inconsistent with federal, state, or local law regarding the use of telephone company facilities for illegal purposes," 47 C.F.R. § 64.604(a)(2)(ii), but do not allege that CAs were supposed to terminate calls once they discovered that the calls were made for illegal purposes, such as the scams described herein.

their costs from a fund, called the "TRS Fund," to which all interstate telecommunications providers contribute and which always has been administered by a private party.  See 47 U.S.C § 225(d)(3)(B); 47 C.F.R. § 64.604(c)(5)(iii).  The TRS Fund was established in July 1993. From 1993 to June 30, 2011, the TRS Fund Administrator was the National Exchange Carrier Association, Inc. ("NECA"), a trade association of local exchange carriers.  Rolka Loube Saltzer Associates, LLC ("RLSA"), another private entity, succeeded NECA on July 1, 2011.  (U.S. Compl. ¶ 10; FAC ¶¶ 43, 51.)  See FCC Release, 2011 WL 1325535 (Apr. 6, 2011).

Each year the FCC (based on input from the Administrator) predicts the costs that providers will incur in the upcoming year to provide TRS service and that the Administrator will incur to administer the Fund.  47 C.F.R. § 64.604(c)(5)(iii)(B). Based on the ratio of expected Fund expenses to the expected interstate end-user telecommunications revenues, the FCC determines the percentage of their revenues that interstate carriers must contribute to the Fund. Id.  The Fund Administrator handles the invoicing and collection of carrier contributions.  Since 2004, IP Relay service has been reimbursed at the rate of approximately $1.30 per minute.  (U.S. Compl. ¶ 10; FAC ¶ 56.)

In addition, the FCC periodically determines per-minute rates for each type of TRS service.  47 C.F.R. § 64.604(c)(5)(iii)(E).  (U.S. Compl. ¶ 10.)  Based on these rates, TRS providers submit monthly requests for reimbursement for the total number of minutes of each type of TRS service that they provided in the prior month.  Since April, 2011, a senior executive of the TRS provider has certified on each monthly claim for payment that, inter alia, minutes submitted to the Fund administrator for compensation "were handled in compliance with section 225 of the Communications Act and the Commission's rules and orders . . . ."  VRS, 26 FCC Rcd. 5545, 5586-87 ¶¶ 90-91 (2011); 47 C.F.R. § 64.604(c)(5)(iii)(D)(5)(ii), (c)(5)(iii)(I).  (U.S.

4

Compl. ¶ 14.)  Under the FCC's regulations, "the TRS Fund Administrator shall make payments only to eligible TRS providers operating pursuant to the mandatory minimum standards as required in § 64.604." 47 C.F.R. § 64.604(c)(5)(iii)(E).

If the TRS total payments and administrative expenses are less than the carriers' contributions in a given year, fewer contributions will be required the next year.  By contrast, if expenses exceed contributions in a given year, the Fund Administrator is to borrow funds commercially, with the loans secured by future increases in contribution levels.  47 C.F.R. § 64.604(c)(5)(iii)(B).

FCC Treatment of International IP Relay Calls

On March 28, 2003, the FCC directed NECA to suspend reimbursement payments for international IP Relay calls.  See TRS, 18 FCC Rcd. 12823, 12833 ¶ 26 & n.73, 12837 ¶ 42 (2003); 19 FCC Rcd. 12224, 12242 n.121 (2004) ("The Interstate TRS Fund does not currently reimburse providers for the costs of providing international calls via IP Relay.").  (U.S. Compl. ¶ 12.)  This statement was repeated verbatim in a June 30, 2004 Bureau Order.  TRS, 19 FCC Rcd. 12224, 12242 ¶ 48, n.121 (2004).

Defendant argues that carriers are required to connect all IP Relay calls, including international ones, but cannot be reimbursed for them.  However, in a June 30, 2004 Report and Order, the FCC stated that:

> We believe the parties are confusing our rules governing the provider's compensation for eligible TRS services from the Interstate TRS Fund, with our rules concerning the provider's ability to charge the TRS user for the long distance (including international) charges that apply to such calls. The Interstate TRS Fund does not currently reimburse providers for the costs of providing international calls via IP Relay. No such restriction currently applies, however, to international VRS calls. At the same time, for IP Relay we have waived the interexchange carrier of choice requirement so long as the provider does not charge for the long distance call. Therefore, IP Relay providers may charge for long distance calls if they offer carrier of choice; they may even do so for

> international IP Relay calls, although, as noted above, they will not be
> compensated from the Interstate TRS Fund for the TRS minutes involved in such
> a call. With respect to VRS, we have similarly conditioned our waiver of the
> carrier of choice requirement on the VRS providers offering free long distance
> calls to the VRS customer. At the same time, as with IP Relay, we clarify that the
> VRS provider may charge for the long distance call provided it offers carrier of
> choice; this rule also applies to international VRS calls.

TRS, 19 FCC Rcd. 12475, 12525 ¶ 129 (2004) (footnotes omitted).  Thus, contrary to

AT&T's contention, the FCC has stated that carriers will not be reimbursed from the TRS

Fund for international IP Relay calls, even if they decide to carry them (or even if they

feel obligated to do so).

Defendant indicates that fraudsters responded to attempts to curb fraud by constantly

changing IP addresses, and by disguising foreign-originated IP Relay calls as domestic calls by

using a U.S. IP address to re-originate calls placed from overseas. (U.S. Compl. ¶ 22; see IP

Relay, 27 FCC Rcd. 1569, 1575 (2012).)  In 2006, the FCC stated that although it "ha[d] worked

with the providers on ways to eliminate or minimize these fraudulent purchase calls, it does not

appear that the frequency of such calls has significantly diminished." TRS, 21 FCC Rcd. 5478,

5481 ¶ 8 (2006).

In 2011, the FCC stated that it had not "allow[ed] compensation for IP Relay calls that

originate or terminate outside the United States," citing to the June 2004 Bureau Order.  VRS, 26

FCC Rcd. 5545, 5563, ¶ 31 & n.97 (2011).  See also Id. at 5564 ¶ 32 n.106 ("All international IP

Relay calls, regardless of where they originate or terminate, will continue to be

noncompensable.")

The FCC has also ruled that TRS calls not involving a user with a hearing or speech

impairment are not eligible for reimbursement by the TRS Fund.  See, e.g., VRS, 25 FCC Rcd.

1868, 1872 (2010).  (U.S. Compl. ¶ 13.)

The characteristics of IP Relay services have also led to its use by persons who are not disabled and who are engaged in schemes to use stolen or fake credit cards to defraud U.S. merchants. As the FCC recently stated, IP Relay is attractive to these "fraudsters" because the use of the Internet means that the CA is not transmitting information that identifies the calling party's location and "IP Relay affords users a degree of anonymity that can facilitate fraudulent activity." Refresh Public Notice, 27 FCC Rcd. 1569, 1570 (2012).

<u>AT&T's Provision of IP Relay Service 2003-2008</u>

AT&T began providing IP Relay service in 2003.[5] The United States alleges that, in late 2003, it learned from its CAs that many of its IP Relay callers were placing calls from outside the United States and/or using the system to defraud merchants in the United States. In a typical scam, a caller located in Nigeria or another foreign country places an IP Relay call to a merchant in the United States. The calling party then uses a stolen credit card or counterfeit check or money order to place an order with the merchant for a large amount of goods, sometimes everything the merchant has in stock, for shipment to a foreign location. In one common iteration of this scam, the calling party informs the merchant that he is paying for a shipper that will pick up the goods, but the shipper does not accept credit as a form of payment. The calling party then asks the merchant to charge the credit card an additional amount reflecting the shipping charge, and then send that amount by wire to the calling party so that the shipper can be paid. IP Relay callers engaging in these schemes take advantage of the anonymity provided by the IP Relay system, on which the calling party cannot be visually identified, and its rules prohibiting disclosure of the conversation by the CA. (U.S. Compl. ¶ 15; FAC ¶¶ 33-35.)

The United States alleges that, in an internal analysis in February, 2004, AT&T personnel

---

[5] The Relator alleges that AT&T applied for and became certified to provide IP Relay beginning in 2002. (FAC ¶ 62.)

determined that a substantial number of its IP Relay users were originating calls from overseas locations and/or using the system to commit "commercial and financial fraud" such as the credit card schemes explained above.[6] Since at least early 2004, AT&T received hundreds of complaints from U.S. merchants on the receiving end of fraudulent IP Relay calls. AT&T relay management also received numerous complaints from the CAs that handled fraudulent IP Relay calls. (U.S. Compl. ¶¶ 16-17.)

On or about July 9, 2004, a NECA representative sent an email to representatives of the IP Relay providers, including AT&T, to address the fraudulent IP Relay calls that were being seen on many IP Relay systems. NECA informed the providers, "We cannot stress enough the importance of every provider taking all available steps to eliminate the fraudulent use of IP Relay. A provider suspected of intentionally handling and requesting reimbursement for fraudulent minutes will be reported to the FCC's Enforcement Bureau for further investigation." The United States alleges that, around the same time in early 2004, AT&T instructed its CAs not to intervene in, or disclose the content of, any IP Relay call, including suspected fraud or scam calls. (U.S. Compl. ¶¶ 18-19.)

Instead, in 2004, AT&T adopted a "pegging" system to address IP Relay fraud calls. CAs were instructed to manually "peg" or flag the IP address of a caller by striking a key on their computer terminals during IP Relay calls that were suspected to be fraudulent. On a periodic basis, members of AT&T's technical team dealing with IP Relay issues reviewed the pegged IP addresses and blocked those addresses deemed to be associated with fraudulent usage. AT&T permitted callers with "pegged" IP addresses to continue making IP Relay calls from those

---

[6] The United States has cited to evidentiary materials to provide specific examples of this and other allegations of its complaint (although it has not attached them). It is not appropriate to refer to these materials at this stage of the case.

addresses unless and until the technical team examined and blocked the pegged IP addresses.

The United States alleges that AT&T knew that its pegging system was insufficient to block all international fraud calls because it relied on manual input by CAs. AT&T knew that many CAs failed to "peg" some or all of the fraud calls they handled. (U.S. Compl. ¶¶ 20-21.)

The United States alleges that, despite putting the peg system into place, from 2004 to 2008, AT&T continued to be aware that it was receiving and processing high volumes of fraudulent calls originating outside the United States. (U.S. Compl. ¶ 22.)

FCC's Adoption of Rules Addressing IP Relay Fraud

Defendant notes that, prior to 2009, the FCC took no formal action that was even nominally designed to reduce fraudulent calls. In Public Notices issued in June 2004 and in September 2005, it warned merchants that some people were using IP Relay to place orders with stolen credit cards and that merchants should thus validate credit cards. The FCC stated that CAs can neither terminate calls believed fraudulent nor "interfere with the conversation" nor exercise "a law enforcement role by monitoring the conversations they are relaying." Public Notice, 19 FCC Rcd. 10740, 10741 (2004). The FCC stated that CAs cannot refuse to make a call required by a TRS user because CAs are "transparent conduits" that must "make all outbound calls requested by a TRS user." Public Notice, 20 FCC Rcd. 14717, 14718 (2005).

In a June 1, 2006 Notice of Proposed Rulemaking ("NPRM"), the FCC stated that it was concern[ed] about the "impact" of this "misuse" of IP Relay services on the TRS Fund and on the size of the contributions that carriers were required to make to the Fund. NPRM, 21 FCC Rcd. 5478, 5481 ¶ 7 (2006). (FAC ¶ 38.) The FCC sought comment on proposed modifications to the rules that would allow CAs to determine if a call is illegitimate and to "block, terminate, or refuse to handle the call, alert the merchant who receives the call that the call may be fraudulent,

or take some other steps to prevent the misuse of IP Relay." Id. at 5483 ¶ 12.  But the NPRM noted that these rules raised substantial legal issues under Section 225 (id. at 5482 ¶ 9 & 5483 ¶ 11), stating that the "nature and purpose of TRS" meant that it would be "difficult[]" to "prevent[] fraudulent purchase calls." Defendant states that the FCC has not adopted any of the foregoing proposed rules.

On June 24, 2008, the FCC issued a Report and Order adopting a system requiring registration of all TRS users, including IP Relay users, and assignment to each user of a ten-digit telephone number. First Report and Order, 23 FCC Rcd. 11591 (2008).  Pursuant to this Order, the FCC required IP Relay users to provide registration information, including a "Registered Location," to the default provider of the user's choice prior to receiving a ten-digit phone number and thereby obtaining access to IP Relay services. All existing IP Relay users were required to be registered by December 31, 2008 – later extended to November 12, 2009 – in order to continue using the service.  (U.S. Compl. ¶ 23.)

In the June, 2008 Report and Order, the FCC observed that IP Relay fraud was enabled by the anonymity of a user's geographic location and identity afforded by IP Relay.  The FCC noted that IP Relay providers "generally asserted that a large portion of the fraudulent calls are placed by persons outside the United States using a stolen or fraudulent credit card to order goods to be shipped to a foreign location." 23 FCC Rcd. at 11624 ¶¶ 92-93.  The FCC further stated "We believe that registration of Internet-based TRS users with a default provider and provision of a Registered Location should reduce the misuse of IP Relay by persons seeking anonymity to make fraudulent credit card purchases and engaged in other wrongdoing."  Id. at 11625 ¶ 24.  (U.S. Compl.  ¶ 24.)

On December 19, 2008, the FCC issued a Second Report and Order on the ten-digit

numbering requirement for TRS users. Second Report and Order, 24 FCC Rcd. 791 (2008). In the Second Report and Order, the FCC directed IP Relay providers to "implement a reasonable means of verifying registration and eligibility information," including the consumer's name and mailing address, before issuing the consumer a ten-digit telephone number. Although the FCC did not mandate a particular verification method, it noted that "[s]uch means may include, for example: (1) sending a postcard to the mailing address provided by the consumer, for return to the default Internet-based TRS provider; (2) in-person or on-camera ID checks during registration; or (3) other verification processes similar to those performed by voice telephone providers and other institutions (such as banks and credit card companies)." Id. at 809 ¶ 38. The FCC stated "We expect that these measures will reduce the misuse of Internet-based TRS by those who may take advantage of the anonymity currently afforded users, particularly IP Relay users, without unduly burdening legitimate Internet-based TRS consumers seeking to obtain ten-digit telephone numbers." Id. at 809-10 ¶ 38. (U.S. Compl. ¶ 25.) Defendant notes that under this Order, providers are not required to verify that registrants in fact have speech or hearing disabilities, for the Order adopts "a self certification component requiring consumers to verify that they have a medically recognized hearing or speech disability necessitating their use of TRS." Id. at 809 ¶ 37.

The Order stated that providers must allow newly-registered users "to place calls immediately," before name and address verification occurs, id. at 803, ¶ 25, and the FCC reaffirmed this requirement in a Public Notice issued three weeks before the then-scheduled November 13, 2009 effective date for the verification requirement. See 24 FCC Rcd. 12877, 12878 & n.14 (2009). Under this Order and the FCC's earlier rulings, providers are required to allow new customers to place calls before verification occurs and are prohibited from

terminating these calls. It "require[d] only that Internet-based TRS providers implement a reasonable means of verifying registration and eligibility information that is not unduly burdensome" on legitimate IP Relay service users. Id. 809, ¶ 38 (emphases added). Defendant notes that the FCC did not predict that these verification measures would eliminate the use of IP Relay calls in schemes to defraud U.S. merchants. Rather, the FCC stated only that it "expect[ed] that these measures will reduce the misuse." Id.

In April 2009, AT&T began to implement the FCC's registration verification requirements with a postcard system like the one referenced in the Second Report and Order. Under this system, each IP Relay registrant provided his name and U.S. mailing address. AT&T then sent to the address provided a postcard containing a verification code. Upon receipt of the postcard, the user logged on to AT&T's system, entered the code, and was then assigned a ten-digit number enabling him to place IP Relay calls. If a registrant was sent a postcard and did not respond within fifteen days, another postcard was sent. If the registrant did not respond within another fifteen days, he was denied access to AT&T's IP Relay system. (U.S. Compl. ¶ 26.)

While the postcard system was in place, AT&T relay personnel expected that the system would curtail IP Relay fraud volume. Using the postcard registration system, between April, 2009, and September, 2009, AT&T registered approximately two IP Relay users per day. By mid-September, 2009, AT&T had registered only approximately twenty percent of its existing IP Relay users. The United States alleges that AT&T knew that most or all of the unregistered users were international fraudsters. (U.S. Compl. ¶¶ 27-28.)

The United States alleges that, due to the low registration rates, AT&T relay managers grew concerned that AT&T was losing IP Relay customers to competitor providers. AT&T managers were also concerned that, at just two or three new registered users per day, AT&T

would fall short of internal projections for IP Relay minutes and related revenue after the November 12, 2009, registration deadline. In response to concerns about a drop in call volume, by early October, 2009, relay managers decided to change from the postcard system to an "eRegistration" process that would allow new AT&T registrants to get a ten-digit number at least as quickly as they could on some other providers' systems. Under the proposed eRegistration system, postcards would no longer be used. Instead, when each user logs on to AT&T's IP Relay system, he is asked for his name, mailing address, and email address. AT&T then queries a list of mailing addresses called the DASH database to determine if the address provided actually exists. If the address provided matches one in the DASH database, the user is registered and assigned a ten-digit number instantaneously.

The United States alleges that the AT&T relay managers devising the eRegistration system knew that this system would not verify that each user is actually located at the provided U.S. mailing address or that the person is who he says he is. (U.S. Compl. ¶¶ 29-30.)

The proposed change to the eRegistration system was ultimately approved by Senior Vice President Susan Johnson, and then communicated to Mike Yoest, AT&T's regulatory liaison for the company's Customer Information Services group, which oversees relay services. On the morning of October 7, 2009, Yoest and other AT&T representatives held an ex parte conference call with several FCC officials to provide a "courtesy notification" of AT&T's proposed eRegistration process. The FCC officials participating in the call questioned whether the proposed process complied with the Second Report and Order mandating that providers verify the accuracy of registrants' name and mailing address, and specifically questioned how the process would address IP Relay fraud issues. (U.S. Compl. ¶¶ 31-32.)

Despite the FCC's stated concerns about AT&T's proposed eRegistration process and IP

Relay fraud issues, on or about October 28, 2009, AT&T switched to the eRegistration process and ended the postcard verification system. Immediately after switching to eRegistration, AT&T's new user registrations increased from approximately two per day to between 40 and 100 per day. The United States alleges that, soon after the November 12, 2009, deadline, AT&T relay personnel realized that the eRegistration procedure was facilitating fraudulent use of AT&T's IP Relay by a large number of callers located outside the United States. (U.S. Compl. ¶¶ 35-36, 38.)

The United States alleges that, in late 2009 and early 2010, it was widely believed among AT&T relay personnel that the eRegistration system facilitated high volumes of calls by international fraud users and that more rigorous procedures were needed to reduce access by these users. Certain managers expressed a need for AT&T to return to a more rigorous registration process such as the postcard method to address high volumes of fraud calls.

In late February, 2010, managers also observed that AT&T's long-standing "peg count" system "has reached the end of its usefulness" as it was no longer able to effectively block international fraud calls. On or about March 7, 2010, a discussion occurred about AT&T's IP Relay traffic being "out of control" and a proposal to go back to a postcard verification system, in part to avoid "unwanted NECA auditing and pressure." AT&T employees were aware that large numbers of IP Relay fraud calls by Nigerian and other users outside the United States continued to be placed on their system through 2010 and beyond. (U.S. Compl. ¶¶ 39-41.)

AT&T employees also evaluated variations in IP Relay call volumes by determining whether Nigerian holidays had an impact on callers. The United States alleges that, despite its knowledge that its eRegistration and use of the DASH database were facilitating abuse of its IP Relay system by a huge number of fraud callers, and despite the belief by many relay managers

that a different system was needed to address this problem, AT&T has not stopped using the eRegistration system. (U.S. Compl. ¶¶ 42-43.)

With its eRegistration system, AT&T has also failed to adopt any procedure to detect and prevent the use of a single U.S. mailing address by numerous different IP Relay registrants as their Registered Location. A large number of IP Relay fraudsters have exploited this aspect of AT&T's eRegistration to register using false names and addresses. The United States alleges that, even after being notified of this, AT&T failed to stop large numbers of users from registering with the same U.S. mailing address. (U.S. Compl. ¶ 44.)

Since November, 2009, up to as much as ninety-five percent (95%) of AT&T's IP Relay calls have been made by non-hearing impaired callers outside the United States attempting to defraud merchants within the United States through the use of stolen credit cards, counterfeit checks and money orders, and by other illicit means. Every month since December, 2009, AT&T has submitted claims to the TRS Fund for reimbursement of its IP Relay minutes. All of those claims sought payment for IP Relay minutes including fraudulent calls originating outside the United States by users without a hearing impairment. (U.S. Compl. ¶¶ 46-47; FAC ¶¶ 72-77.)

Relator alleges that she discovered that many of the IP Relay calls were fraudulent and that AT&T managers, who would sit with CAs once a month, were well aware of this fact and told the CAs to keep processing them. (FAC ¶¶ 79, 82-83.) Indeed, she alleges that, in February 2007, AT&T made CAs sign a confidentiality agreement in which they agreed to process all calls or risk being terminated (and they were not allowed to have a copy of this agreement). (FAC ¶ 84.)

Since April, 2011, on each monthly claim for payment from the TRS Fund, AT&T Senior Vice President Susan Johnson has signed a statement certifying that the minutes submitted for

reimbursement "were handled in compliance with section 225 of [the] Communications Act and the Commission's rules and orders . . . ." The United States argues that every one of these monthly certifications is false because AT&T knowingly failed to handle its IP Relay minutes in compliance with the address verification requirements set forth in the FCC's 2008 Second Report and Order.

Since December, 2009, the TRS Fund has paid AT&T over $16 million in reimbursement of IP Relay minutes. Up to as much as ninety-five percent (95%) of these payments were made for non-compensable IP Relay calls, specifically calls originating outside the United States and/or made by users without a hearing impairment. (U.S. Compl. ¶¶ 48-49.)

On February 13, 2012, the FCC issued a Public Notice that requested parties to "refresh the record" in the 2006 rulemaking proceeding discussed above. Public Notice, 27 FCC Rcd. 1569 (2012). The FCC stated that it remains concerned that "individuals who do not have a hearing or speech disability may be continuing to misuse IP Relay by, for example, calling merchants to place orders using fake, stolen, or otherwise invalid credit cards." Id. at 1569. The FCC also stated that it "may need to impose additional and more specific requirements with respect to both authenticating initial registrants and verifying users of the service." Id. at 1573.

The FCC asked parties to address possible modifications to its rules. The FCC asked if it should eliminate the "temporary authorization" which requires that providers complete calls of newly registered users "even if the provider had not completed the process of verifying the caller's information." Id. at 1574. The FCC also sought comments on whether "geolocation systems" could be used to determine when IP Relay calls originate in foreign countries and to identify these calls even when a party to the call "disguise[s] the IP Relay call as a domestic U.S. call by, for example, directing the call through a domestic IP address." Id. at 1575. The FCC

further asked if it should cease relying on "self-certification" of speech and hearing impairments and should instead require users to demonstrate program eligibility by providing documentation of a disability or through similar measures. Id. at 1574.

Relator's Additional Allegations

Relator worked for AT&T beginning in 1997 and as a CA from 2002 until she was terminated on February 25, 2010. (FAC ¶¶ 5, 125-26, 155.) She brings her claims as an original source based upon her own independent experiences and personal knowledge she obtained and/or gained through her own efforts while working as a CA and not based upon any public disclosures. She provided the required pre-complaint disclosure to the federal government. (FAC ¶¶ 16-19.) She alleges that AT&T made false claims seeking reimbursement from the TRS Fund as far back as 2002. Relator charges that all of AT&T's requests for reimbursement from the TRS Fund were false because the IP Relay calls AT&T handled included calls from "Nigerians," not having speech or hearing disabilities, who targeted U.S. merchants with various scams. (FAC ¶¶ 33-39.) She further alleges that, beginning in April 2002, AT&T's monthly requests for reimbursement were for calls of which up to 95% were ineligible, that it did not comply with FCC rules and that she tried to sabotage fraudulent calls, which eventually resulted in her termination. (FAC ¶¶ 72-77, 107-08, 110-13, 130-33.)

Procedural History

Relator filed this action on October 19, 2010 (ECF No. 3). On December 21, 2011, the United States filed its Notice of Election to Intervene in Part and to Decline to Intervene in Part (ECF No. 20) and on March 21, 2012, the United States filed its Complaint in Intervention (ECF No. 29). Jurisdiction is based on the FCA, 31 U.S.C. §§ 3730 and 3732, as well as 28 U.S.C. §§ 1331 and 1345. Jurisdiction over the state-law claims is based on 28 U.S.C. § 1367(a).

Count I of the Complaint in Intervention alleges that Defendant violated the FCA, 31 U.S.C. § 3729(a)(1)(A), since December 2009 and continuing through at least January 2012, by knowingly presenting, or causing to be presented, false or fraudulent claims for payment of non-compensable IP Relay calls. Count II alleges that Defendant violated the FCA, 31 U.S.C. § 3729(a)(1)(B), since April 2011 and continuing through at least January 2012, by knowingly making or causing to be made or used, false records or statements material to false claims for reimbursement of non-compensable IP Relay calls by the TRS Fund Administrator. Count III alleges that Defendant has been unjustly enriched by these practices. Count IV alleges that Defendant has caused the United States to make payments under a mistake of fact.

On March 21, 2012, Plaintiff filed the FAC (ECF No. 31). Count I alleges that Defendant violated the FCA, 31 U.S.C. § 3729(a)(1)(A), from 2002 through October 31, 2009 by knowingly presenting, or causing to be presented, false or fraudulent claims for payment of non-compensable IP Relay calls. Count II alleges that Defendant violated the FCA, 31 U.S.C. § 3729(a)(1)(B), from 2002 through October 31, 2009, by knowingly making or causing to be made or used, false records or statements material to false claims for reimbursement of non-compensable IP Relay calls by the TRS Fund Administrator. Count III alleges that Defendant violated the FCA, 31 U.S.C. § 3729(a)(1)(C), and/or the Anti-Kickback Act, 42 U.S.C. § 1320a-7b, from 2002 through October 31, 2009, by willfully and knowingly combining, conspiring, confederating and agreeing between its departments and or auxiliary companies to defraud the United States and agencies thereof. Count IV alleges that Defendant violated the FCA, 29 U.S.C. § 3729(a)(1)(G), from 2002 through October 31, 2009 by knowingly making a false record or statement material to the obligation and statutory regulation of all telecommunication companies to pay or transmit money to the FCC. Count V alleges that

18

Defendant engaged in inflated billing to the TRS Fund for expenses from 2002 through October 31, 2009. Count VI alleges that Defendant retaliated against her in violation of the FCA, 29 U.S.C. § 3730(h), from 2002 through October 31, 2009. Count VII alleges that Defendant violated public policy by its actions between 2002 and October 31, 2009.[7]

On April 27, 2012, Defendant filed a Motion to Dismiss the Complaint in Intervention of the United States (ECF No. 44) and on April 28, 2012, Defendant filed a Motion to Dismiss the Plaintiff-Relator's Amended Complaint (ECF No. 47). The motions have been fully briefed and argued and are ripe for disposition.

<u>Standard of Review</u>

The Supreme Court recently issued two decisions that pertain to the standard of review for a motion to dismiss for failure to state a claim upon which relief could be granted under Federal Rule of Civil Procedure 12(b)(6). The Court held that a complaint must include factual allegations that "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 232 (3d Cir. 2008). In determining whether a plaintiff has met this standard, a court must reject legal conclusions unsupported by factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements;" "labels and conclusions;" and "'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Iqbal</u>, 556 U.S. at 678 (citations omitted). A mere "possibility" of misconduct is insufficient. <u>Id.</u> at 679. District courts are required to engage in a two part inquiry:

_____

[7] As noted below, Relator has agreed to dismiss Counts III-VII.

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions…. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show the plaintiff has a "plausible claim for relief." … In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted).

"Although a district court may not consider matters extraneous to the pleadings, 'a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.'" U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)). "Courts ruling on Rule 12(b)(6) motions may take judicial notice of public records." Anspach ex rel. Anspach v. City of Phila., 503 F.3d 256, 273 n.11 (3d Cir. 2007). Thus, the public records the parties have referred to in the pleadings (specifically FCC orders, public notices, etc.) may be considered without converting the motions into motions for summary judgment. On the other hand, some of the exhibits attached to the parties' briefs are not referenced in the Complaints, nor are they all public records. Thus, they should not be considered in connection with the motions to dismiss.

The Court of Appeals has held that "plaintiffs must plead FCA claims with particularity in accordance with Rule 9(b)." United States ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295, 301 n.9 (3d Cir. 2011) (citing United States ex rel. LaCorte v. Smith-Kline Beecham Clinical Labs., 149 F.3d 227, 234 (3d Cir. 1998)).

With respect to both complaints, Defendant argues that: 1) the requests for compensation from the TRS Fund Administrator were not "claims" under the FCA because the TRS Administrator is not an "agent" of the United States and the requests for compensation did not

concern funds "provided" or "reimbursed" by the United States; 2) the complaints have not and cannot allege that any claim AT&T submitted to the TRS Fund Administrator was false under either a theory of "factual falsity" (because AT&T did not make affirmative misrepresentations) or a theory of "legal falsity" (because AT&T cannot be held liable for failing to comply with a verification requirement that is vague and should be considered by the FCC in the first instance); and 3) the complaints have not adequately alleged scienter in that AT&T did not "knowingly" submit false claims.  In addition, with respect to the Complaint in Intervention, Defendant argues that the common law claims in Counts III (unjust enrichment) and IV (payment under mistake of fact) similarly require money to be paid by the United States and are therefore similarly subject to dismissal.

With respect to the Relator's FAC, Defendant also argues that: 1) a corporation cannot "conspire" with its own wholly-owned subsidiaries or departments and the Anti-Kickback Act applies only to health care programs, so the claims in Count III should be dismissed; 2) a relator must meet the heightened pleading standards of Rule 9(b) and she has not done so; 3) the common law claims in Counts V (inflated billing to TRS Fund for expenses) and VII (violation of public policy) must be dismissed because Relator suffered no injury and she cannot bring third-party claims; and 4) Count VI (retaliation) should be dismissed because she did not engage in protected conduct or suffer discrimination as a result thereof.

In her brief in response, Relator agreed to the dismissal of the Anti-Kickback Act claim in Count III, the FCA retaliation claim (Count VI) and the violation of public policy claim (Count VII) (ECF No. 52 at 1).  In addition, at the hearing on November 13, 2012, Relator agreed to the dismissal of the FCA conspiracy claim in Count III, the reverse false claim (Count IV) and the inflated billing claim (Count V).  Thus, she has consented to the dismissal of Counts

III-VII. The United States consents to the dismissal of these claims, without prejudice to its ability to resubmit them on its own behalf if it should decide to do so.

However, the Relator argues that: 1) Defendant has not explained how the FAC fails to meet Rule 9(b) standards and she has alleged that AT&T knowingly submitted false and fraudulent claims for payment each month from 2002 through October 31, 2009; 2) the FCC does treat TRS Fund contributions as money owed to the United States and Fund payment as money provided by the United States; 2) the Fund Administrator is an agent of the United States; 3) the claims were false because international calls are not "interstate" and have not been compensable by the Fund since at least 2003 and AT&T knew this; 4) the claims were also false because A&T certified that its applications were for compensable calls; and 5) scienter has properly been alleged.

In its reply brief, Defendant reiterates its arguments that the applications are not claims because the United States does not "provide" any portion of the funds, the Fund Administrator is not an "agent" of the United States, the FCC ruling stated only that calls that lacked "one end" in the United States would not be compensable and that call data had to be "true and accurate" (not that minutes had to be "legitimate"), and that she has failed to allege scienter because AT&T's beliefs were objectively reasonable.

The United States responds that: 1) the Administrator is an agent of the United States for purposes of reimbursing money from the Fund (even if not for other purposes); 2) the money is "provided by" the United States because it is collected based on Congressional levy and because it is a line item in the federal budget; 3) AT&T's requests for reimbursement were factually false because they sought reimbursement for calls not covered by IP Relay, namely calls originating outside the United States and/or calls in which neither party had a hearing disability and AT&T

knew this; 4) AT&T's requests for reimbursement for calls in which neither party has a hearing disability were outside the statutory definition of TRS and the FCC never "acquiesced" in such billing; 5) AT&T falsely certified that it had complied with § 225 and FCC rules and orders but failed to actually comply and false claim liability under § 3729(a)(1)(B) requires only a false statement material to a false claim, regardless of whether payment is involved, and AT&T's "reasonable interpretation" is irrelevant; 6) scienter has been properly pleaded because specific intent to defraud is not required and it has alleged that, since 2009, AT&T deliberately adopted a user registration and verification process it knew was deficient and that, since 2011, an AT&T executive has certified compliance with all FCC orders and regulations, and there is no basis to conclude that the FCC knew what AT&T was doing and even if so the issue cannot be decided in the context of a motion to dismiss; and 7) the common law claims are sufficiently pleaded for the reasons outlined above.

Defendant argues in its reply brief that: 1) the Administrator is not an "agent" of the FCC because it had no authority to bind the FCC by its actions; 2) the contractor provision does not apply because the United States does not "provide" the funds and the arguments about "deeming" should be rejected; 3) falsity claims cannot be based on alleged violations of a regulation unless it is clear and absolutely conditions compensation on perfect compliance, but the FCC regulation only requires a "reasonable method" that is not "unduly burdensome" and the agency should resolve this matter in the first instance; 4) the FCC has never barred compensation for IP Relay calls originating in foreign countries (only those that terminated overseas); 5) FCC rules do not prohibit compensation for IP Relay calls between persons who do not have hearing disabilities; 6) the express certification claim is also barred because perfect compliance is not required; 7) the United States has failed to allege scienter because AT&T's position was

objectively reasonable; and 8) the common law claims should be dismissed for the same reasons.

On July 6, 2012, Defendant filed a Notice of Supplemental Authority (ECF No. 61). Defendant observed that, on June 29, 2012, the FCC issued an order which did the following: 1) recognized that the FCC's 2008 orders allowed users to obtain a "guest number," use it to place unlimited calls until it was cancelled and then "re-register" multiple times and thus acknowledged that compliance with verification requirements would not have made a difference; 2) confirmed that providers cannot readily determine if callers have a disability or are calling from outside the United States; 3) confirmed that the FCC had not ruled that these calls were non-compensable and had not directed the Administrator to halt compensation for them; and 4) demonstrated that a question remains as to whether putative violations could be deemed to have resulted in unlawful compensation. Id. Ex A.[8] Therefore, Defendant contends that the June 29, 2012 order further supports its arguments that the FCA claims should be dismissed.

In response, the United States argues that: 1) the facts of the complaints must be taken as true, and it has alleged that AT&T tried postcard registration, but the process was not helpful to its call volume and revenue goals so it switched to instant registration (despite the FCC's concerns), leading to a spike in fraudulent calls; 2) the "guest user" issue discussed in the June 29, 2012 order is irrelevant and the argument that AT&T "cannot determine" the location or status of a caller is contrary to the allegations of the complaint; and 3) there is no "open regulatory issue" because the FCC has said many times that IP Relay calls originating from overseas are not compensable.

Finally, in a surreply brief, the United States argues that: 1) the Administrator is an agent of the United States under the Restatement's definition and the ability to "bind" a principal is

---

[8] This First Report and Order has been published at 27 FCC Rcd. 7866 (2012).

merely an example which would never apply in the case of a non-governmental entity, which cannot legally bind the United States; 2) fraudulent requests for payment from the TRS Fund cause an "economic loss" to the United States by drawing down a federal, Treasury-designated special fund account devoted to TRS services and it is irrelevant that one consequence is that the Administrator must collect more fees from carriers or that the TRS program is "not subject to the annual budget process" (it is a permanent and indefinite appropriation), the funds do not have to come out of the "treasury" so long as they advance a federal program or interest, and the United States provides the funds because federal action requires their transfer and they are treated as if directly paid by the United States; and 3) AT&T's claims on the Fund are false because the calls are non-compensable and the United States is not merely relying on the 2003 FCC order but also 7 others that long banned compensation for international IP Relay minutes, nor is it possible to argue that the TRS program allows for compensation for calls that do not involve a disabled individual.

Counts I-II: FCA Claims

In its most current form, the FCA provides that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1) (2009). The United States indicates that, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties

were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

(U.S. Compl. ¶ 6.)

> For purposes of the FCA, the terms "knowing" and "knowingly"
>
> (a) mean that a person, with respect to information—
>
>> (i) has actual knowledge of the information;
>>
>> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>>
>> (iii) acts in reckless disregard of the truth or falsity of the information; and
>
> (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1). Following the Fraud Enforcement and Recovery Act of 2009, Pub. L.

111-21, 123 Stat. 1617 (2009) ("FERA"), the term "claim":

> (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
>
>> (i) is presented to an officer, employee, or agent of the United States; or
>>
>> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>>
>>> (I) provides or has provided any portion of the money or property requested or demanded; or
>>>
>>> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2) (2009). "A plaintiff, in order to establish a prima facie FCA violation

under section 3729(a)(1), must prove that '(1) the defendant presented or caused to be presented

to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and

(3) the defendant knew the claim was false or fraudulent.'" United States ex rel. Wilkins v.

United Health Group, Inc., 659 F.3d 295, 304-05 (3d Cir. 2011) (quoting United States ex rel.

Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 (3d Cir. 2004)).

<u>Whether the TRS Fund Administrator is an "Agent" of the United States</u>

As cited above, one definition of the term "claim" is a request for money that is made to, inter alia, an "agent" of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). Plaintiffs allege that the TRS Fund Administrator is an agent of the United States, but Defendant contends otherwise.

The term "agent" is not specifically defined in the FCA and the parties concur that the term must be given its "ordinary, contemporary, common meaning." <u>United States v. Maurer</u>, 639 F.3d 72, 77-78 (3d Cir. 2011). They also agree that reference should be made to the Restatement (Third) of Agency § 1.01.

The Restatement provides that:

> Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

Based on this text, the two requirements appear to be that the agent act on the principal's behalf and that the agent be subject to the principal's control. Defendant argues that an agent must also have authority to take action that "binds" the principal, and there is no dispute that the Administrator has no such authority. It bases this argument on a comment in the Restatement section, which states that an agent "acts as a representative of or otherwise acts on behalf of another person with power to affect the legal rights and duties of the other person." Restatement (Third) of Agency § 1.01, cmt. c. It further contends that a court of appeals has held that NECA "is neither an independent federal agency nor a subagency of the FCC." <u>Farmers Tel. Co. v. FCC</u>, 184 F.3d 1241, 1250 (10th Cir. 1999).

The United States responds that an agency relationship can exist for some purposes but not others, and the <u>Farmers</u> case concluded that NECA "has no authority to issue binding

interpretations of FCC regulations" regarding exchange carrier tariffs.  Id.  That issue is not presented in this case.  The Farmers case is not on point.

The United States notes that an entity such as the Administrator can act as the agent of the government without performing "inherently governmental functions."  In fact, agencies such as the FCC are prohibited from delegating inherently governmental functions to private entities. See 31 U.S.C. § 501, sec. 5(2)(A) (defining inherently governmental functions as those "so intimately related to the public interest so as to require performance by Federal Government employees.")  This includes "the interpretation and execution of the laws of the United States so as … to exert ultimate control over the acquisition, use, or disposition of the property … of the United States, including the collection, control, or disbursement of appropriate and other Federal Funds."  Id. Sec. 5(2)(B)(v).  However, it does not include the "collection of fees, fines, penalties, costs or other charges … where the amount to be collected is predetermined or can be readily calculated and the funds collected can be readily controlled using standard cash management techniques."  OMB Final Policy Letter, 76 Fed. Reg. 56227 ¶ 20(a).  The United States contends that the collection of TRS funds is not an inherently governmental function because it is performed according to pre-determined formulas approved by the FCC.  47 C.F.R. § 64.604(c)(5)(iii)(E).

Thus, the United States argues that NECA (and subsequently RLSA) functioned as an agent of the United States in the context of collecting and disbursing TRS funds.   The United States also notes that another comment to the Restatement section explains that an agency relationship exists where the principal "initially states what the agent shall or shall not do" and retains authority to give interim instructions and, if necessary, terminate the agency relationship. Restatement § 1.01, cmt f.  Pursuant to this definition, the FCC's regulations, orders and

contracts: 1) set out what NECA and RLSA "shall do" (that is, collect TRS contributions and cost data from carriers) and "shall not do" (exercise inherently governmental functions), 47 C.F.R. § 64.604(c)(5)(iii); 2) established that the FCC retained the right to give interim instructions (such as setting the amount of Fund contributions by a "contribution factor" determined annually by the FCC); and 3) provided that the FCC retained the right to replace the Administrator (as it did in 2011 when it contracted with RLSA to take over for NECA).

The United States points out that no entity can legally "bind" the government in the way Defendant suggests. Restatement (Third) of Agency § 2.03, cmt. g (agents serving governmental principals can act only within their actual authority); § 3.04, cmt. d (the "legally operative actions that may be taken by governments and subdivisions of governments are often specified by statute, constitution, or charter. This in turn limits a governmental principal's capacity to authorize agents.") Rather, the United States contends that, when an entity acts pursuant to federal law authorizing it to take a certain action, it is the agent for the federal government with respect to that action. See Hendler v. United States, 952 F.2d 1364, 1378-79 (Fed. Cir. 1991) (when California state officials took action to clean up a superfund site, their actions were attributable to the federal government for takings purposes because they "could not, absent proper legislative authority, lawfully enter plaintiffs' property.")

The United States notes that NECA was authorized to collect and disburse TRS funds by a series of FCC orders authorizing it to act as Administrator. See TRS, 8 FCC Rcd. 5300, 5301 ¶ 7 (1993). Those orders were authorized by the ADA and the Communications Act, which impose on the FCC a mandate to "ensure that [TRS] is available … to individuals in the United States with hearing and speech disabilities." Id. at 5300 ¶ 2; 47 U.S.C. § 225(b)(1). The TRS Fund was created by FCC rules, not by the Administrator, and the FCC rules state that it chooses

who administers the Fund. 47 C.F.R. § 64.604(c)(5)(iii). Federal law requires interstate telecommunications carriers to make contributions to the Fund. 47 U.S.C. § 225(d)(3)(B); 47 C.F.R. § 64.604(c)(5)(iii)(A), (B). Similarly, federal law authorizes the Administrator to pay out funds and audit TRS providers to ensure they are providing accurate data. 47 U.S.C. § 225(d)(3)(B); 47 C.F.R. § 64.604(c)(5)(iii)(E), (I).

Defendant argues that the United States's position erases the distinction between "agents" and "contractors," despite the fact that the FCA distinguishes between the two. It notes that when the FCC solicited a replacement for NECA in 2011, it referred to the position as "contractor" and stated that it "shall not perform any tasks that are inherently governmental functions." (ECF No. 46 at 19 & Ex. E at 35.) The Court need not resolve this question, however, because Defendant's position creates the greater problem of eliminating the possibility of an "agent" because no non-governmental entity has the power to "bind" the United States, yet the FCA specifically applies to "agents."

The Court concludes that the United States has sufficiently demonstrated that NECA (and subsequently RLSA) collected and disbursed TRS funds on behalf of the FCC, pursuant to federal law and acted on the FCC's behalf and subject to its control. The FCC's regulations, orders and contracts set out what NECA and RLSA "shall do" (that is, collect TRS contributions and cost data from carriers) and "shall not do" (exercise inherently governmental functions), 47 C.F.R. § 64.604(c)(5)(iii); established that the FCC retained the right to give interim instructions; and provided that the FCC retained the right to replace the Administrator (as it did in 2011 when it contracted with RLSA to take over for NECA). Thus, the Court concludes that NECA and RLSA meet the definition of "agents" for purposes of disbursing TRS Funds and permit an allegation that a false "claim" was submitted under § 3729(b)(2)(A)(i) of the FCA.

However, the preceding discussion concerns the FCA as amended by FERA on May 20, 2009 and the Relator's claim extends from 2002 to October 31, 2009. In other words, the FCA provision discussed would apply only to the period of the Relator's claims between May 20, 2009 and October 31, 2009. Prior to that time, this definition of the term "claim" did not include requests made to an agent of the United States, only those made to an "officer" or "employee." See 31 U.S.C. § 3729(a)(1) (1986).[9] Relator does not contend that the Fund Administrator was an "officer" or "employee" of the United States, and there would be no support for this position in any event.

Defendant argues that, while the FERA amendments apply generally to conduct occurring on or after its date of enactment (May 20, 2009), an exception is the amendment to what has been codified at § 3729(a)(1)(B), which is to be applied retroactively to claims pending on or after June 7, 2008, 123 Stat. 1617, 1625, but courts have held that this refers to "claims for payment," not actions pending on that date. United States Dep't of Transp. Ex rel. Arnold v. CMG Eng'g, 745 F. Supp. 2d 637, 646 n.7 (W.D. Pa. 2010). It further argues that a number of courts have held that retroactive application of the provision violations the Constitution's ex post facto clause. United States v. Hawley, 812 F. Supp. 2d 949, 961-62 (N.D. Iowa 2011); United States ex rel. Baker v. Community Health Sys., Inc., 709 F. Supp. 2d 1084, 1112 (D.N.M. 2010); United States ex rel. Sanders v. Allison Engine Co., 667 F. Supp. 2d 747, 756 (N.D. Ohio 2009).

At the hearing, Plaintiffs noted the recent decision by the Court of Appeals for the Sixth Circuit, Sanders v. Allison Engine Co., 2012 WL 5373532 (6th Cir. Nov. 2, 2012), which reversed the decision of the district court cited above. As the Relator summarized, in that case,

---

[9] The term "claim" also applied then (as now) if the request was made to a contractor, grantee or other recipient, but only if the United States Government "provides any portion of the money or property." 31 U.S.C. § 3729(b)(2)(A)(ii)(I) (2009); § 3729(c) (1986). This provision is discussed below.

the court performed a detailed analysis of the FERA amendments and concluded that: 1) the term "claims" refers to cases, not claims for payment; and 2) retroactive application of the amendment does not violate the ex post facto clause because the factors fail to demonstrate a sufficiently punitive purpose or effect to transform what was denominated a civil penalty into a criminal penalty.[10]  Applying § 3729(a)(1)(B) retroactively, Relator could proceed with the express legal falsity claim in Count II of the FAC because it was pending after June 7, 2008.  However, as discussed below, prior to April 2011, there was no basis for an express legal falsity claim because there was no requirement that an executive certify that the IP Relay calls were handled in compliance with the Communications Act and the FCC's rules and orders.

Whether the United States "Provides" Any Portion of TRS Funds

Plaintiffs also invoke another definition of the term "claim," which defines a request for money made to a contractor, if the money is to be spent to advance a government program and the government "provides or has provided any portion of the money or property requested or demanded."  § 3729(b)(2)(A)(ii)(I) (2009); § 3729(c) (1986).  Defendant argues that the money is not "provided" by the United States but by interstate telephone carriers, 47 C.F.R. § 64.604(c)(5)(iii)(A).  It contends that to argue otherwise rests on one of two unsupportable bases: 1) that the United States should be "deemed" to have provided the money because it requires it to be collected; or 2) that the United States should be "deemed" to have provided the money because it treats the funds no differently than government funds collected as tax revenues or by other Congressional levies.

---

[10] Somewhat oddly, considering the amount of discussion and the importance of this issue, the Sixth Circuit has marked this case "not for publication."  Nevertheless, it can unquestionably be cited for the fact that it reverses the holding of the district court Allison Engine and undermines the holdings in the other two cases Defendant cites, which relied on Allison Engine for their conclusions.

The United States responds that AT&T concedes that the funds requested have been designated for the advancement of a government program or interest and argues that they are "provided" by the United States because they are collected pursuant to Congressional levy and because they are included in the United States budget.

Plaintiffs aver that monies in the TRS Fund have been included in the United States budget since 1995 and apportioned by the Office of Management and Budget, and are considered to be appropriated funds. The President's 2012 budget includes $698 million in TRS receipts and outlays. Because the TRS Fund is included in the federal budget, the FCC is required to include the TRS Fund in its annual financial statement. Expenditures from the TRS Fund accordingly reduce the government's and the FCC's total budgetary resources. (U.S. Compl. ¶ 11; FAC ¶ 42.)

Defendant responds that the inclusion of TRS in the federal budget is a device that allows OMB to review the FCC's TRS administration and that subjects the program to other requirements, such as Generally Accepted Accounting Principles. However, it has no implications for the FCA.

The Court of Appeals has held that "submission of false claims to the United States government for approval which do not cause financial loss to the government are not within the purview of the False Claims Act." Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 184 (3d Cir. 2001) (citation omitted). See also United States ex rel. Sanders v. American-Amicable Life Ins. Co., 545 F.3d 256 (3d Cir. 2008) (no claim under FCA based on allegations that insurance company schemed to sell military personnel life insurance policies in contravention of regulations regarding such sales because payments were made by defrauded personnel, not the government); United States ex rel. Costner v. URS Consultants, Inc., 153 F.3d 667, 677 (8th Cir.

1998) (no FCA liability based on claims made to private trust fund); <u>United States v. Aguillon</u>, 628 F. Supp. 2d 542, 546 (D. Del. 2009) (the false or fraudulent claim must "cause economic loss to the United States Treasury").  Thus, if the United States or a relator is relying upon the definition of the term "claim" that requires that money be "provided" by the government, then the money must actually be provided by the government such that the false claim causes financial loss to the government.  The argument that requests to the TRS Fund for reimbursement "cause economic loss to the United States by drawing down on a federal, Treasury-designated special account devoted to TRS and other universal service programs" is circular and does not demonstrate that the United States "provides" the money.

Relator presents an additional argument, citing to certain regulations that implement the Debt Collection Improvement Act, Pub. L. No. 104-134, 110 Stat. 1321, 1358 (1996).  <u>See</u> 47 C.F.R. Part 1, Subpart O.  Defendant responds that these regulations provide that the FCC will not process applications for licenses and may cause pursuit of other remedies if an interstate carrier does not make its required contributions to the TRS Fund, but have no relevance to the question of whether the United States "provides" the money to the Fund.

At the hearing, the parties reiterated these arguments.  The United States argued that other programs are administered in the same manner and specifically identified the Postal Service and the Federal Housing Administration (FHA) as examples.  It cites a case in which a district court addressed an argument that Postal Service funds were not "government funds" because the FCA applies only to claims against the public fisc:

> But the Seventh Circuit rejected a similar argument in <u>Baker</u> when it held that the Postal Service was a "government agency" exempt from punitive damages in Title VII cases.
>
> > Although the Postal Service is a 'self-funding' entity, this is not to say that it is divorced from the United States Treasury. The Postal Service is self-

> funding only in the sense that Congress has appropriated to it all of the
> Postal Service's own revenues. It nevertheless is 'operated as a basic and
> fundamental service provided to the people by the Government of the
> United States.'

This reasoning applies to a claim under the False Claims Act.

United States v. Hicks, 2008 WL 1990436, at *2-3 (S.D. Ill. May 5, 2008) (quoting Baker v. Runyon, 114 F.3d 668, 672 (7th Cir. 1997)). This is an analogy based upon another analogy and does not support the government's argument.

The United States has not cited a case in which a court has held that, although money was put into a fund and taken out of it by private parties, the United States nevertheless "provided" the funds because it required that such money be paid or because the program is included in the federal budget. In the absence of authority to the contrary, the Court cannot supply a special meaning to the word "provide" to conclude that payments from the TRS Fund cause economic loss to the United States Treasury.

The Court concludes that Plaintiffs cannot proceed under the definition of "claim" in § 3729(b)(2)(A)(ii) and must limit their allegations to "claims" as defined in § 3729(b)(2)(A)(i), which became effective on May 20, 2009. Thus, Relator's claims in Count I are limited to the period beginning May 20, 2009 and ending on October 31, 2009.

Whether Count I of the Complaints Allege Factual Falsity

Count I of the FAC and the Complaint in Intervention allege in part that Defendant presented claims to the government that were factually false in violation of § 3729(a)(1)(A). Defendant argues that the allegations fail to state a claim because they do not meet the requirements for factual falsity when AT&T made no affirmative misrepresentations and the FCC has never held that IP Relay calls originating outside the United States are non-compensable; in fact, Defendant contends that the FCC knew about such calls and permitted

them to continue.  The United States responds that AT&T's interpretation is unsupported by the plain language of the rules, is contradicted by the TRS enabling statutes and is inconsistent with the providers' demonstrated understanding of those rules.  Relator makes the same arguments.

First, Plaintiffs argue that the plain meaning of the term "international" in the TRS context would ordinarily include calls between the United States and another country regardless of where the call originates, and the FCC has never qualified it to rule that IP Relay calls originating outside the United States are compensable by the TRS Fund.   In its very first Order implementing Section 225, the FCC  referred to "international calls" as calls "that originate or terminate in the United States."  TRS, 6 FCC Rcd. 4657, 4661 ¶ 18 (1991).

In 2003, soon after the introduction of IP Relay as a form of TRS, the FCC recognized that many people were misusing the system, and that the biggest problem was international users originating IP Relay calls from overseas locations in an attempt to defraud merchants within the United States.  Accordingly, the FCC directed NECA not to pay providers for "international IP Relay service minutes," without distinguishing between calls originating or terminating in the United States.  See 18 FCC Rcd. 12823, 12837 ¶ 42 (2003).  In turn, on March 28, 2003, NECA emailed representatives of the providers, including AT&T, and informed them that "international IP relay minutes" would not be reimbursed, again without qualification.  (ECF No. 54 Ex. C.)

In 2004, in an order setting IP Relay reimbursement rates, the FCC again stated that the TRS Fund does not reimburse "international calls via IP Relay," again without qualification.  TRS, 19 FCC Rcd. 12224, 12242 n. 121 (2004).  The FCC repeated that statement later in the same year. TRS, 19 FCC Rcd. 12475, 12525 ¶ 129 (2004).  In 2006, the FCC again stated its complete ban on compensation for international IP Relay calls in a Declaratory Ruling discussing reimbursement of international TRS.  TRS Declaratory Ruling, 21 FCC Rcd. 5247,

5250 ¶ 8 & n.20 (2006). The 2006 Order first cited the FCC's 1991 TRS Order to note that the interstate TRS Fund <u>usually</u> supports international TRS calls that "originate or terminate in the United States." <u>Id.</u> (citing 6 FCC Rcd. at 4661 ¶ 18). Citing its 2003 and 2004 TRS orders, the FCC then explained, "IP Relay service is an exception to this rule." <u>Id.</u>

Plaintiffs argue that AT&T's interpretation is further refuted by the FCC's adoption of user registration and verification requirements in 2008. As cited above, in June 2008, the FCC required that providers register all IP Relay users by obtaining their name and location, and then assign each of them a ten-digit telephone like the one used on the voice telephone system. TRS First Report & Order, 23 FCC Rcd. 11591 (2008). In its Order, the FCC specifically discussed the impact on "IP Relay Fraud," and noted that "a large portion" of the fraudulent calls were placed "by persons outside the United States" seeking to defraud merchants in the United States. <u>Id.</u> at 11624 ¶¶ 92-93. The FCC further stated that the user registration system "and provision of a Registered Location should reduce the misuse of IP Relay" by these callers who were previously able to remain anonymous in identity and/or location. <u>Id.</u> at 11625 ¶ 94. In a December 2008 follow-up Order, the FCC required providers to institute procedures to verify the accuracy of each user's registration information, including the user's name and mailing address, in order to ensure that "IP Relay [is] used only for [its] intended purpose." TRS Second Report & Order, 24 FCC Rcd. 791, 809-10 ¶¶ 36-38 (2008). Plaintiffs argue that these measures further undermine AT&T's interpretation, because if the FCC were not concerned about where IP Relay calls originate as AT&T contends, it would not have made the explicit connection between its address registration/verification rule and misuse of IP Relay by persons placing calls from "outside the United States."

Finally, Plaintiffs argue that AT&T's interpretation of the FCC's rules on IP Relay

reimbursement is directly contradicted by the FCC's clear statement in 2011 that it does not

"allow compensation for IP Relay calls that originate or terminate outside the United States."

VRS, 26 FCC Rcd. 5545, 5563 ¶ 31 & n.97 (2011) (emphasis added).  To support this assertion,

the FCC cited to its 2004 Order stating that it does not reimburse "international calls via IP

Relay," thus further demonstrating that its intention has always been that calls originating

overseas are not compensable. Id. (citing TRS, 19 FCC Rcd. at 12242 ¶ 48 n.121).

Defendant argues that this is "careless drafting."  (ECF No. 46 at 8 n.1.)  The United

States argues that AT&T offers no explanation as to why, if the FCC did not mean what it said, it

made the same statement using different language later in the same order: "All international IP

Relay calls, regardless of where they originate or terminate, will continue to be non-

compensable." VRS, 26 FCC Rcd. at 5564 ¶ 32 n.106 (emphasis added).  The United States

indicates that these recent statements by the FCC simply confirm what has been true since 2003

– all international IP Relay calls are non-compensable, without qualification or distinction

between origination and termination points.

In response, AT&T cites a Notice of Proposed Rulemaking (NPRM) and subsequent

Order regarding international Video Relay Services (VRS) calls. VRS NPRM, 25 FCC Rcd.

1868 (2010); VRS Order, 25 FCC Rcd. 6012 (2010).  The United States argues that these

citations are unavailing.  First, AT&T itself observes that the FCC's statements in those orders

were "dictum" because they addressed "rules that apply to VRS." (ECF No. 46 at 8 n.1.)

Second, AT&T similarly ignores the important fact that the FCC expressly treats compensation

of international VRS calls differently from international IP Relay calls.  See 19 FCC Rcd. 12475,

12525 ¶ 129 (2004).  Indeed, that is why the FCC noted in 2011 that, while it does not permit

compensation "for VRS calls that both originate and terminate outside the United States," it also

does not permit compensation "for IP Relay calls that originate or terminate outside the United States." The United States argues that AT&T's out-of-context citation to the 2010 VRS Order, in which the FCC noted that the Fund does not compensate IP Relay calls "terminating overseas," is misleading and inapposite. (ECF No. 46 at 7-8.) That notation was made as part of the FCC's consideration of a new rule prohibiting compensation for VRS calls terminating overseas, because the FCC suspected such calls were being made to artificially inflate call volumes. VRS Order, 25 FCC Rcd. at 6024-25 ¶¶ 28-29. The United States explains that the reference to IP Relay, read in context, is clearly meant to be a mere point of comparison and does not in any way indicate that IP Relay calls originating overseas and terminating in the United States were compensable. The United States argues that AT&T's selective reading of the FCC's VRS orders is inconsistent with the FCC's distinction between VRS and IP Relay, and should be rejected. In fact, the 2010 FCC order cites the 2004 FCC order which clearly stated that the Fund "does not currently reimburse providers for the costs of providing international calls via IP Relay." 25 FCC Rcd. at 6025 n.60 (citing 19 FCC Rcd. at 12242 n.121).[11]

The Court concludes that Defendant has selectively cited out-of-context statements to support its counterintuitive notion that the word "international" is ambiguous (it is not), that it had no reason to know that international IP Relay calls that originated overseas were non-compensable (when it had reason to know this) and that statements by the FCC concerning VRS are equally applicable to IP Relay (they are not).

The Communications Act states as follows:

_____

[11] Plaintiffs also assert that they have proof that AT&T itself was aware that international IP Relay calls were not compensable. However, this argument relies upon evidentiary materials such as emails and AT&T policies that are not part of the record at this stage of the proceedings, and will not be considered. For purposes of these motions, it is sufficient that Plaintiffs allege what AT&T knew or had reason to know.

> In order to carry out the purposes established under section 151 of this title, to make available to all individuals <u>in the United States</u> a rapid, efficient nationwide communication service, and to increase the utility of the telephone system of the Nation, the Commission shall ensure that <u>interstate</u> and <u>intrastate</u> telecommunications relay services are available, to the extent possible and in the most efficient manner, to hearing-impaired and speech-impaired individuals <u>in the United States</u>.

47 U.S.C. § 225(b)(1) (emphasis added). Not only does the statute refer twice to hearing and speech-impaired individuals "in the United States," but it explicitly refers to interstate and intrastate (but not international) TRS services. As the United States observes, it is unfathomable to conclude that the FCC would expect IP Relay to be used by non-speech-impaired and non-hearing-impaired individuals outside the United States to perpetrate the scams alleged in this case.

Plaintiffs also contend that AT&T is also completely wrong in suggesting its claims were not false because the FCC "has knowingly allowed compensation to be paid on these calls" and required providers to carry them. Far from "acquiescing" in the providers' billing of international, hearing-to-hearing fraud calls, the FCC issued extensive orders regarding registration and verification of users' identity and location – orders that AT&T deliberately failed to heed. See TRS First Report & Order, 23 FCC Rcd. 11625; TRS Second Report & Order, 24 FCC Rcd. at 809-10 ¶¶ 36-38. Moreover, the FCC has been very clear that IP Relay providers are not required to carry international IP Relay calls. To the contrary, the FCC has stated that while TRS providers generally must relay international TRS calls, "IP Relay service is an exception to this rule." TRS, 21 FCC Rcd. at 5967 & n.23. Indeed, the FCC declared that providers could charge users for international IP Relay calls, but they would not be reimbursed from the Fund. TRS, 19 FCC Rcd. at 12525 ¶ 129.

Finally, the United States argues that AT&T has provided no evidence whatsoever that

the FCC knew that AT&T sought payment for non-compensable IP Relay calls on any particular reimbursement claim, or approved AT&T's submission of claims for such calls. To the contrary, it has alleged that FCC staff specifically questioned whether the relaxed user registration process that AT&T ultimately implemented was compliant with its user registration and verification rules. (U.S. Compl. ¶¶ 33-35.)

Under the FCA, a claim is factually false "when the claimant misrepresents the goods or services that it provided to the Government." Wilkins, 659 F.3d at 305. To make a claim of factual falsity, the Government must show that the defendant "submitted" 'an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" United States ex rel. Conner v. Salina Regional Health Ctr., Inc., 543 F.3d 1211, 1217 (10th Cir. 2008) (quoting United States ex rel. Mikes v. Straus, 274 F.3d 687, 696 (2d Cir. 2001)). Plaintiffs have properly alleged that AT&T submitted requests for reimbursement from the TRS Fund while knowing, or having a reasonable basis to know, that the requests were for calls that originated outside the United States and were thus non-compensable. Therefore, Defendant's argument that the complaints fail to state a claim for factual falsity should be rejected.

Whether Count I of the Complaint in Intervention Alleges Legal Falsity

Defendant argues that the Complaint in Intervention cannot state a claim for "legal falsity" based on implied certification because the December 2008 verification order with which it allegedly did not comply was not codified and vaguely referred to taking "reasonable" methods that are not "unduly burdensome" to legitimate IP Relay users, thus it cannot form the basis for this claim.[12] The United States responds that AT&T's claims were legally false because they

_____

[12] Defendant also applies this argument to the FAC to the extent it alleges an implied false

41

implied compliance with statutes, regulations and FCC orders indicating that calls originating outside the United States and/or in which the calling party did not have a hearing impairment are not compensable from the TRS Fund.

A claim is legally false "when the claimant knowingly falsely certifies that is has complied with a statute or regulation the compliance for which is a condition for Government payment." Wilkins, 659 F.3d at 305. The Court of Appeals has further explained that:

> There is a further division of categories of claims as the courts have recognized that there are two types of false certifications, express and implied. Under the "express false certification" theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds. There is a more expansive version of the express false certification theory called "implied false certification" liability which attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment. Thus, an implied false certification theory of liability is premised "on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." Mikes, 274 F.3d at 699; see also United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("Courts infer implied certifications from silence where certification was a prerequisite to the government action sought." (internal quotation marks and citation omitted)).

Id. (citing Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 303 (3d Cir. 2008), abrogated on other grounds, United States ex rel. Eisenstein v. City of New York, 556 U.S. 928 (2009)) (other citations omitted). In Wilkins, the Court expressly adopted the implied false certification theory of liability. Id. at 306. However, the Court observed that "the implied certification theory of liability should not be applied expansively, particularly when advanced on the basis of FCA allegations arising from the

---

certification claim. However, it is not clear that the FAC makes such a claim, the allegations extend only to October 2009 (but the verification order was not issued until November 2009) and Relator has not addressed this argument in her response brief. Therefore, the Court will not address it herein.

Government's payment of claims under federally funded health care programs." Id. at 307.

This case does not concern Medicare or any other federally funded health care program. Thus, the cautionary language in Wilkins may not be applicable to the present situation. In addition, Wilkins was based on alleged violations of Medicare's marketing regulations; whereas in this case the United States is alleging that AT&T submitted requests for reimbursement from the TRS Fund when it knew or should have known that the calls for which it sought reimbursement were not compensable.

AT&T notes that the FCC's registration and verification requirements are not codified in 47 C.F.R. § 64.604. The registration requirement is codified in § 64.611, and the verification requirement is not codified in the Code of Federal Regulations at all. Defendant argues that the registration and verification requirements therefore are not "mandatory minimum standards as required in § 64.604" that a provider must satisfy in order to be eligible to receive compensation. See § 64.604(c)(5)(iii)(E). It also contends that the FCC has not otherwise conditioned the payment of compensation on compliance with the verification requirement. The United States responds that its claim is not based upon AT&T's violation of the registration and verification requirements. Rather, it references compliance issues for the purpose of alleging AT&T's knowledge that it was submitting claims for ineligible calls: it alleges that AT&T believed its user verification procedures fell short of what the FCC required, that it knew those deficient procedures allowed numerous ineligible calls to be processed and billed and that it deliberately failed to change those procedures to stop billing for ineligible calls.

Defendant also argues that the FCC long had "knowledge" that IP Relay service providers were submitting requests for compensation involving calls that were non-

compensable and "acquiesced" in the practice, thereby precluding plaintiffs from contending that these were "false" claims. It cites United States ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 545 (7th Cir. 1999), to support the argument that, "[i]f the Government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim." However, the Durcholz case does not stand for the proposition that whenever the government is aware of a potentially fraudulent practice and takes no action, it has ratified it and is precluded from bringing an FCA claim. "It is not merely government *knowledge* of falsity that precludes and FCA claim, but government *encouragement* and *involvement* in the submission of those claims." United States v. Menominee Tribal Enterprises, 601 F. Supp. 2d 1061, 1074 (E.D. Wis. 2009). No such circumstances of encouragement and involvement apply here. In addition, both Durcholz and United States ex rel. Watson v. Connecticut General Life Insurance Co., 2003 WL 303142 (E.D. Pa. Feb. 11, 2003), cited by Defendant, were decided in the context of motions for summary judgment, not motions to dismiss.

Under the FCA, "claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed." United States ex rel. Walker v. R&F Properties of Lake County, Inc., 433 F.3d 1349, 1356 (11th Cir. 2005) (citations omitted). See also United States v. Southland Mgmt. Corp., 326 F.3d 669, 674-75 (5th Cir. 2003) (claims are false if they seek money "to which the defendant is not entitled"). The United states alleges that AT&T was seeking reimbursement for services that it knew, or had a reasonable basis to know, were not reimbursable. This allegation states a claim under the FCA.

Whether Count II of the Complaints Allege Legal Falsity by Express Certification

Plaintiffs also assert liability under an FCA provision that addresses a party who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false claim." 31 U.S.C. § 3729(a)(1)(B). Since April 2011, FCC regulations have required an executive of each IP Relay provider to certify a form indicating that "[t]he TRS calls for which compensation is sought were handled in compliance with Section 225 of the Communications Act and the Commission's rules and orders…." 26 FCC Rcd. at 5587 ¶ 90. 47 C.F.R. § 64.604(c)(iii)(D)(5)(ii). The United States alleges that, because AT&T knowingly failed to comply with the user registration and address verification requirements set forth in the FCC's Second Report and Order, each monthly certification since April 2011 was a false statement material to the false claim on which it was made. Relator alleges that from 2002 to October 31, 2009, AT&T submitted monthly reports that falsely certified that the minutes for which it was seeking reimbursement were true and accurate.

Defendant argues that the (1) the "handling" of IP Relay calls did not include proper registration and verification of IP Relay users, (2) this was a "reasonable interpretation" held by AT&T, and (3) compliance with the registration and verification rules was not a "prerequisite to government payment." (ECF No. 46 at 27-28.) The United States argues that AT&T's argument wrongly conflates two distinct bases of FCA liability: "false claim" liability under § 3729(a)(1)(A) is completely separate from "false statement" liability under § 3729(a)(1)(B). The Third Circuit has held that a claim can be "false" under § 3729(a)(1)(A) if a defendant falsely certifies compliance with a regulation that is a condition of payment. Wilkins, 659 F.3d at 305. But a statement need not be a certification of compliance with a "prerequisite to government payment" to be deemed false or purposes of § 3729(a)(1)(B). That section simply requires that the false statement be "material to a false claim." Id. Here, the FCC ordered IP

Relay providers to register and verify the location and identity of their users, at least in part to reduce misuse by ineligible users. The United States has adequately pleaded that AT&T's knowingly false certifications of compliance with those provisions, which are required by federal law, were material to its false claims for payment of calls by ineligible users. (U.S. Compl. ¶ 48, 54.)

Defendant argues that the FCA is not designed to "short circuit" the remedial process that the government has established to address claims of non-compliance, citing <u>Wilkins</u>, 659 F.3d at 310. But <u>Wilkins</u> was addressing the fact that the government has an administrative mechanism for managing and correcting Medicare marketing violations. Defendant has not pointed to an equivalent mechanism for FCC registration and certification violations. Moreover, a false statement that is material to a false claim is actionable under § 3729(a)(1)(B) regardless of whether an agency has in place an administrative mechanism to address it.

On the other hand, Relator's claim does not refer to a specific statute, regulation or FCC order that AT&T allegedly violated. Rather, her claim appears to be based on the proposition that AT&T was under a general obligation from the beginning to verify that IP Relay calls were not originating from overseas and/or that it was not seeking reimbursement for such calls. Although such actions by AT&T would have been laudable, the Court concludes that these allegations fail to state a claim for legal falsity based upon express certification. Therefore, with respect to Count II of the FAC, the motion to dismiss should be granted.

<u>Whether Scienter Has Been Properly Alleged</u>

Defendant argues that scienter has not been properly alleged because "no allegations of fact could establish" that it knew its claims were false. The United States argues that specific intent to defraud is not required and that it has properly alleged that, in late 2009, AT&T adopted

a user registration and verification process that it knew was deficient – that is, that it knew contravened the FCC's goal of reducing misuse of the IP Relay system by ineligible users – because it feared a drop in call volume and related revenues. (U.S. Compl. ¶¶ 29-35.) AT&T knew that its system allowed huge numbers of ineligible users to register posing as deaf Americans and make calls on its system – up to 95% of its call volume – yet made the deliberate decision not to change it. (Id. ¶¶ 38-44.)

AT&T then billed the TRS Fund for all of these calls while its own employees acknowledged that they were occurring as a result of its deficient processes. (Id. ¶¶ 37-39, 47.) All of this conduct occurred well after numerous pronouncements by the FCC that international IP Relay calls were non-compensable. The United States need not prove actual knowledge of those requirements, as AT&T suggests, because recklessness or deliberate ignorance suffice to show knowledge under the FCA. See 31 U.S.C. § 3729(b)(1)(A). Moreover, AT&T has a legal duty to familiarize itself with the legal requirements for payment in a federal program like the TRS program. See, e.g., Heckler v. Community Health Services of Crawford Cty., Inc., 467 U.S. 51, 63 (1984) ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law.").

Similarly, on each of AT&T's requests for reimbursement since April, 2011, an AT&T executive certified compliance with the Communications Act and the FCC's rules and orders. As described above, AT&T knew at the time of each of those submissions that it was at least risking non-compliance with the FCC's registration and verification rules, and it had actual knowledge that its deficient system contravened Section 225 because it facilitated calls to which no deaf American was a party. Accordingly, each certification was a "false statement material to a false claim" that was known to be false when made, in violation of § 3729(a)(1)(B). The

United States argue that this is a separate basis for liability from false claim liability, and it is utterly irrelevant whether AT&T knew "that compliance with verification requirements was a condition of payment of compensation," (ECF No. 46 at 28-29).

As indicated above, the Court concludes that the United States has sufficiently alleged scienter, in that AT&T knew, or had a reasonable basis to know, that the IP Relay calls for which it sought reimbursement were not compensable because they originated outside the United States and/or were placed by individuals who did not have a hearing disability and that the AT&T executive who certified since April 2011 that AT&T was complying with the Communications Act and the FCC's rules and orders knew, or had a reasonable basis to know, that this was not the case because of the nature of these calls. That is sufficient and with respect to Counts I and II of the Complaint in Intervention, the motion to dismiss should be denied.

<u>Whether the Government's Common Law Claims Are Sufficient</u>

Defendant challenges the United States' claims for unjust enrichment (Count III) and payment under a mistake of fact (Count IV), contending that both claims require proof that the money received was "paid by the government" and that they require that the money be paid erroneously. It cites <u>United States v. Albinson</u>, 2010 WL 3258266 (D.N.J. Aug. 16, 2010), in which the court dismissed both claims because the government did not allege that Albinson received payment from the government. In this case, the United States has alleged that AT&T received money from the government by its actions. "The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute." <u>United States v. Wurts</u>, 303 U.S. 414, 415 (1938).

As discussed above, although the United States has not demonstrated that it "provides"

the money to the TRS Fund, it has sufficiently alleged that the TRS Fund Administrator was its "agent" with respect to requests for reimbursement from the fund. The parties have not presented further details as to the elements of claims for unjust enrichment and payment under a mistake of fact, but the sole argument Defendant relies on should be rejected. Therefore, with respect to Counts III and IV of the Complaint in Intervention, the motion to dismiss should be denied.

For these reasons, it is recommended that Defendant AT&T's Motion to Dismiss the Complaint in Intervention of the United States (ECF No. 44) be denied. It is further recommended that Defendant AT&T's Motion to Dismiss the Amended Complaint of Plaintiff/Relator (ECF No. 47) be granted with respect to Counts II, III, IV, V, VI and VII and denied with respect to Count I, which is limited to the period between May 20, 2009 and October 31, 2009.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections within the time specified in the Notice of Electronic Filing. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will waive the right of appeal.

Respectfully submitted,


s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: November 15, 2012