UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RENE SHUPE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:10-CV-8 |
| | § | |
| CISCO SYSTEMS, INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court are Defendants' motions to dismiss Relator Rene Shupe's First Amended Complaint (FAC). (D.E. 47, 50, and 51.) Each Defendant filed a separate motion to dismiss, but all joined in the others' motions where applicable; therefore, their arguments are addressed collectively herein. For the reasons set forth below, Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Relator, Rene Shupe, brings this *qui tam* action on behalf of the United States, alleging that Defendants violated the False Claims Act (FCA), 31 U.S.C. § 3729, *et seq*. Relator asserts that Defendants violated the FCA by presenting materially false or fraudulent claims for payment or approval by the United States, by using or causing to be used false records or statements regarding equipment to be installed, and by conspiring with each other to defraud the United States by submitting false or fraudulent claims for

1

reimbursement. (See generally allegations set forth in Relator's First Amended Complaint (FAC) at docket entry 32.)

Relator worked for Defendant Avnet as a project manager and designer from January 2003 through January 2005. Defendant Avnet is an installer of Cisco network infrastructure and has installed numerous communications networks for Texas schools and libraries. Defendant Calance manages Defendant Avnet's data and voice networks. Defendant Cisco designs and markets telecommunications and networking equipment.

Defendants bid on and were awarded contracts for equipment and services relating to the installation and operation of communications networks for school districts and libraries throughout South Texas. Partial funding for the installation and operation of these networks was provided through the United States government's Education Rate (E-Rate) Program.

In the Communications Act of 1934, Congress created the Federal Communications Commission (FCC) for the purpose (among others) of "mak[ing] available, so far as possible, to all the people of the United States . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges . . . ." 47 U.S.C. § 151. In 1996, Congress passed the Telecommunications Act, which requires that providers of telecommunications services should make an equitable and non-discriminatory contribution to the preservation and advancement of universal service, including access to advanced telecommunications

2

services for schools and libraries. § 254.  Congress vested the details of implementing the provision of universal service in the FCC. §§ 254(a)&(b).

The FCC established the Universal Service Administrative Company (USAC) to administer the support mechanisms called for in the 1996 Act. 47 C.F.R. §§ 54.1, 54.701. The USAC is a private, non-profit corporation that collects mandatory contributions from telecommunications carriers to the Universal Service Fund and distributes the funds to schools and libraries to provide them with access to telecommunications technology. §§ 54.701, 54.702.  The distribution of these funds is administered through the E-Rate Program. §§ 54.500–54.523; *Alpha Telecommunications, Inc. v. IBM Corp.*, 194 Fed. App'x 385, 386 (6th Cir. 2006).   The E-Rate Program funds telecommunications services, internet access, internal connections, and basic network maintenance in the form of discounts on the price of eligible services. § 54.502.

To obtain funds through the E-Rate Program, an applicant must develop a technology plan which provides an assessment of the telecommunication services, hardware, software, and other services that will be needed to improve the applicant's communications services. § 54.508(a).  The applicant then submits a plan for approval to either the state, the USAC, or an independent entity approved by the FCC or certified by the USAC as qualified to provide approval. § 54.508(d).

Next, the applicant files a Form 470 (also known as a Request for Proposals or "RFP") with the USAC to begin the competitive bidding process.  The form includes (1)

3

a list of specified services for which the applicant anticipates it is likely to seek discounts, (2) sufficient information to enable bidders to reasonably determine the needs of the applicant, and (3) a certification that the entity seeking the discounts is qualified to do so under the applicable statutes and regulations. § 54.503(c). After receiving bids and selecting a service provider, the applicant submits a Form 471 to the USAC, certifying that it has complied with all the requirements of the program and the competitive bidding process, and requesting discounts for services. § 54.504. All entities participating in the program must conduct a fair and open competitive bidding process. § 54.503(a).

Relator asserts that Defendants tampered with the E-Rate competitive bidding program, engaged in the gold-plating of equipment provided to schools and libraries under the E-Rate Program, and substituted E-Rate ineligible products for eligible ones. Relator asserts that these actions constituted violations of the FCA, which prohibits the submission of false or fraudulent claims. *Schindler Elevator Corp. v United States ex rel. Kirk*, 131 S.Ct. 1885, 1889 (2011).

## LEGAL STANDARDS

### A.   FED. R. CIV. P. 12(b)(6)

On a Rule 12(b)(6) motion to dismiss, the Court must examine the complaint in the light most favorable to Plaintiff, accepting all allegations as true and drawing all reasonable inferences in favor of Plaintiff. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982); *Piotrowski v. City of*

4

*Houston*, 51 F.3d 512, 514 (5th Cir. 1995). The Court need not, however, accept as true legal conclusions masquerading as factual allegations, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff must allege sufficient facts that give rise to a reasonable inference that Defendants are liable. *Id.*; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The factual allegations must raise Plaintiff's claim for relief above the level of mere speculation. *Twombly*, 550 U.S. at 555. As long as the complaint, taken as a whole, gives rise to a plausible inference of actionable conduct, Plaintiff's claims should not be dismissed. *Id.* at 555–56. This test of pleadings is devised to balance Plaintiff's right to redress against the interests of the parties and the Court in minimizing expenditures of time, money, and resources. *Id.* at 557–58.

### B.    FED. R. CIV. P. 9(b)

Actions brought under the FCA must also meet Rule 9(b)'s heightened pleading standard, which requires that a party must state with particularity the circumstances constituting fraud or mistake. *Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Rule 9(b) is an exception to Rule 8(a)'s simplified pleading that calls for a "short and plain statement of the claim." *Id.* In cases of fraud, Rule 9(b) plays a screening function, weeding out meritless fraud claims sooner rather than later. *Id.* Nevertheless, Rule 9(b) does not represent a subscription to fact pleading and requires only simple, concise, and direct allegations of the circumstances constituting fraud. *Id.* at 186 (citing *Williams v.*

*WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) and *Twombly*, 550 U.S. at 570). The time, place, contents, and identity standard of fraud pleading should not be a straightjacket. "Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claims Act." *Grubbs*, 565 F.3d at 190. In the FCA context, "a relator's complaint, if it cannot allege the details of an actually submitted claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that false claims were actually submitted." *Id.*

## ANALYSIS

### A.     FAC's Allegations Not Based Upon Publicly Disclosed Information

Defendants argue that Relator's claims should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction because they are based on publicly disclosed information, and therefore, this Court does not have jurisdiction to hear them. (D.E. 51-1 at 4–28.)

The FCA limits federal court jurisdiction over *qui tam* suits when the information on which the suit is based has been publicly disclosed. The statute states:

No court shall have jurisdiction over an action under this section . . . unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A) and (B).[1]

The purpose of this jurisdictional bar is to accommodate the primary goals of the FCA which are to promote private citizen involvement in exposing fraud against the government and to prevent "parasitic lawsuits by late-comers who add nothing to the exposure of the fraud." *United States ex rel. Reagan v. East Texas Medical Center*, 384 F.3d 168, 173 (5th Cir. 2004) (internal citations omitted).   The jurisdictional inquiry requires three questions: (1) whether there has been a public disclosure of the allegations or transactions; (2) whether the *qui tam* action is based upon such publicly disclosed allegations; and (3) if so, whether the relator is the "original source" of the information. *Id.* The three steps need not be rigidly followed, and combining the first two steps can be useful because it allows the scope of the relator's action in step two to define the "allegations or transactions" that must be publicly disclosed in step one. *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011) (citing *United States ex rel. Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008)).   "That is, for the public-disclosure bar to apply, the publicly disclosed allegations or transactions need only be as broad and as detailed as those in the relator's complaint, because that is all that is needed for the action to be 'based on' the publically disclosed allegations." *Jamison*, 649 F.3d at 327.

---

[1] Subsection 3730(e)(4) was amended on March 23, 2010 as part of the Patient Protection and Affordable Care Act; however, the changes do not apply to cases pending at the time of amendment. *Graham County Soil and Water Conservation Dist. v. United States*, 559 U.S. 280, n. 1 (2010). The present case was filed on January 8, 2010, and therefore, pending at the time of the amendment.   Accordingly, the Court applies the pre-amendment version of § 3730(e)(4) to the case at hand.

If, however, an industry is large and the publicly disclosed information discusses

wide-spread fraud, the disclosure may not trigger the jurisdictional bar.   In *Cooper v.*

*Blue Cross and Blue Shield of Florida*, 19 F.3d 562, 566 (11th Cir. 1994), the relator

alleged the defendant insurance company committed fraud against the government by

submitting his claims to Medicare when the company knew that it, as the primary insurer,

was required to pay the claim.   The insurer cited five public disclosures which it claimed

barred the relator's claim, but the court found that the allegations of widespread fraud in

the sources did not name or otherwise specifically identify the specific defendant.   *Id.*

> Requiring that allegations specific to a particular defendant be publically
> disclosed before finding the action potentially barred encourages private
> citizen involvement and increases the chances that every instance of specific
> fraud will be revealed.   To hold otherwise would preclude any *qui tam* suit
> once widespread—but not universal—fraud in an industry was revealed.
> The government often knows on a general level that fraud is taking place
> and that it, and the taxpayers, are losing money.   But it has difficulty
> identifying all of the individual actors engaged in the fraudulent activity. . . .
> This casting of a net to catch all wrongdoers is precisely where the
> government needs the help of its "private attorneys general."

*Id.* (citing False Claims Act Implementation: Hearing Before the Subcomm. on Admin.

Law and Gov. Relations of the House Comm. on the Judiciary, 101st Cong., 2d Sess. 3

(1990)).

When a complaint alleges specifics, such as a defendant's name and a specific

time period, and offers details about the scheme, it is crucial to consider whether the

disclosures correspond in scope and breadth. *Little v. Shell Exploration and Production*

*Company*, 690 F.2d 282, 293 (5th Cir. 2012).   A guiding query is whether " 'one could

8

have produced the substance of the complaint merely by synthesizing the public disclosure's description' of a scheme." *Id.* (quoting *Jamison*, 649 F.3d at 331).

Defendants submitted the following exhibits in support of their argument that the information in Relator's FAC had been publicly disclosed:

- Office of the Inspector General (OIG) Report dated October 31, 2002 (D.E. 51-3 at 10–43);
- Congressional Report on Waste, Fraud, and Abuse Concerns with the E-Rate Program, dated November 2005 (D.E. 51-3 at 45–53);
- Letter of July 14, 2003 to Defendant Avnet from the Congressional Subcommittee on Oversight and Investigations (D.E. 51-3 at 62–64);
- FCC, Office of the Inspector General, Semiannual Report to Congress, Oct. 1, 2004–Mar. 31, 2005 (D.E. 51-3 at 66–68);
- FCC, Office of the Inspector General, Semiannual Report to Congress , Apr. 1, 2005–Sept. 30, 2005 (D.E. 51-3 at 70–73);
- FCC, Office of the Inspector General, Semiannual Report to Congress , Oct. 1, 2005–Mar. 31, 2006 (D.E. 51-3 at 75–78);
- Audits of E-rate Recipients for the Years 2004–2009 (D.E. 51-4 at 2–17);
- Testimony at Congressional Hearing held on September 22, 2004 (D.E. 51-4 at 19–27);
- Indictment and Conviction of Rafael Gongora Adame (D.E. 51-4 at 29–44);
- Indictment of Ruben B. Bohuchot, Frankie Logyang Wong, and William Frederick Coleman, III (D.E. 51-4 at 46–86);
- FCC Investigation at DISD (D.E. 51-5 at 13–36); and
- Links to various other websites (D.E. 51-1 at 16–24).

None of these documents indicate that there had been a public disclosure of Relator's allegations or that this *qui tam* action is based upon publicly disclosed allegations. While the documents showcase problems identified by Congress and the FCC in regard to the E-Rate Program, as well as specific problems in the Dallas, Brownsville, and the Donna Independent School Districts, they do not address the

9

specific allegations alleged by Relator.   Based on the record before it, the Court

concludes that Relator could not have produced the substance of his claims from public

disclosures.  The E-Rate Program has thousands of participating entities, and nothing in

the public documents provided by Defendants would have set the government firmly on

the trail of the alleged fraud without Relator's assistance.  Accordingly, Relator's claims

are not subject to dismissal pursuant to the public disclosure bar.

### B.      Claims Made Before January 8, 2004 Barred by Statute of Limitations

The statute of limitations on an FCA claim brought by a *qui tam* relator is six

years. 31 U.S.C. 3731(b)(1); *United States ex rel. Erskine v. Baker*, No. 99-50034, 2000

WL 554644 (5th Cir. Apr. 13, 2000).  The limitations period runs from the date on which

the false claims are filed. *Smith v. United States*, 287 F.2d 299, 304 (5th Cir. 1961).

Relator filed this action on January 8, 2010.  Accordingly, any false claims made prior to

January 8, 2004 are time-barred.

### C.      FAC Alleges with Sufficient Particularity Plausible Causes of Action Against Defendants Cisco and Avnet Arising Under 31 U.S.C. §§ 3729(a)(1)–(3)

Defendants argue that Relator's three FCA causes of action, alleging violations of

31 U.S.C. §§ 3729(a)(1)–(3), must be dismissed for the following reasons:  (1) the USAC

is not a government body or funded with federal dollars; (2) the alleged actions taken by

Defendants do not constitute false claims under the FCA; (3) Relator did not plead his

fraud claims with sufficient particularity under Rule 9(b); (4) Relator failed to allege its

claims against Defendants Cisco and Calence with sufficient particularity; and (5) any

causes of action against Defendant Calence alleged to have arisen before July 14, 2005 must be dismissed because the company did not exist before that date.  Each of these arguments are addressed below.

> 1.      *Requests for Reimbursement Submitted to the USAC May Constitute False or Fraudulent Claims Under the FCA*

Defendants argue that all three of Plaintiff's causes of action under §§ 3729(a)(1)–(3) must be dismissed because the FCA applies only to false or fraudulent claims submitted to the United States government for payment with federal funds, as set forth in § 3729(c) of the pre-2009 version of the FCA. (D.E. 47 at 18–25; D.E. 51-1 at 28–29.) Defendants argue that because the funds collected by the USAC are not deposited into the United States Treasury, but are deposited into the Universal Service Fund and administered by a private, non-governmental organization, the United States government does not receive or provide any of the funds distributed to the applicants, and therefore, the FCA does not apply. (*Id.*)

The Court disagrees that funds must be deposited into the Treasury and/or distributed by a government body for there to be a claim under the FCA.  Under the pre-2009 version of the FCA, a claim was defined as

> any request or demand, whether made under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

§ 3729(c) (2008).  Under the current version of the FCA, a claim is defined as

11

any request or demand, whether under a contract or otherwise, for money or property . . . that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

§ 3729(b)(2)(A) (2013). There is no requirement under either version of the FCA that funds come out of the U.S. Treasury. The only requirement is that the government provide or reimburse a portion of the money or property that is requested.

The USAC is a privately funded, non-profit organization; however, the funds administered by the USAC are collected under a mandate from the federal government set forth by Congress in the Communications Act, and the funds are distributed in accordance with regulations established by the FCC. The funds are clearly provided by the government, as there would be no funds for the USAC to administer but for the actions of Congress in passing the Telecommunications Act and the FCC in setting up and administering the USAC. Therefore, the fact that the funds collected are not first paid into the Treasury does not preclude the application of the FCA. *See United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295, 304 (4th Cir. 2009) ("statutory language precludes an interpretation requiring that the U.S. retain control over funds used to pay claims by extending the reach of the Act to money in the hands of a U.S.

12

government 'grantee' or 'other recipient' "); *Baker v. Runyan*, 114 F.3d 668, 670 (7th Cir. 1997) ("Postal Service may be run in a manner *similar* to a private commercial entity, but it is not a private commercial entity"); *United States ex rel. Shank v. Lewis Enters., Inc.*, No. 04-CV-4105-JPG, 2006 WL 1207005, at *7 (S.D. Ill. May 3, 2006).

The FCA's broad definition of a claim supports the application of the Act to claims for USAC funds.   Under the FCA, claims are actionable if presented to a contractor, grantee, or other recipient to whom the government provides any portion of the money or property requested; and under the amended Act, a claim is also actionable if made to a government agent.   The USAC qualifies as a grantee, recipient, and agent.   The USAC was created by the FCC under a Congressional mandate to provide universal communications services to schools and libraries.   Thus, even though the USAC is a privately funded, non-profit organization, its existence and funding is the result of a Congressional mandate that narrowly prescribes the limited activities which the organization may pursue.   The USAC is the recipient and grantee of the Universal Service Fund monies raised by the levy on telecommunications carriers, and the USAC acts as an agent of the government in the distribution of those funds. *See id.*

The FCA's legislative history further supports a broad application of the Act. Before 1986, the term "claim" was not defined in the FCA; however, in 1986, the Act was amended by Congress in response to the decision in *United States v. Azzarelli Construction Co.*, 647 F.2d 757, 761 (7th Cir. 1981).   *See* S. Rep. 99-345 at 22 (1986).

The *Azzarelli* court concluded that because the federal contribution to highway construction was a fixed sum, rather than open-ended, the federal government could not sue contractors who engaged in bid rigging. The panel reasoned that the overcharge did not affect the government's overall contribution to the project. *Id.* The Senate committee amended the FCA, adding a broad definition of the term claim "to overrule *Azzarelli* and similar cases which have limited the ability of the United States to use the act to reach fraud perpetrated on federal grantees, contractors, or other recipients of federal funds." S. Rep. 99-345 at 22.

In sum, the Court rejects Defendants' argument that requests to the USAC for payments from the Universal Service Fund do not constitute claims under the FCA.

2.  *Relator's Allegations of Bid Tampering, Gold Plating, and Product Substitution State Plausible Causes of Action Against Defendants Under §§ 3729(a)(1) and (2) and Are Stated with Sufficient Particularity*

Defendants assert that counts one and two of Relator's FAC, alleging violations of §§ 3729(a)(1) and (2) of the FCA, should be dismissed because the actions about which Relator complains—tampering with the bidding process, the gold-plating of products and services, and the substitution of ineligible products—are not prohibited by the FCA, and moreover, they were not pleaded with sufficient particularity as required for fraud claims under Rule 9(b). (D.E. 47 at 25–33; D.E. 50 at 16–19.)

To state a claim for relief under §§ 3729(a)(1) and (2) of the FCA, a relator must allege (1) a false statement or fraudulent course of conduct; (2) that was knowingly made

14

or carried out; (3) that was material; and (4) that caused the government to pay out money (i.e., the statement or conduct must have been related to a claim). *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009). For Defendants to have acted knowingly, they must have had actual knowledge of the falsity of the statement or conduct, acted with deliberate ignorance to the truth or falsity of the statement or conduct, or acted with reckless disregard of the truth or falsity of the statement or conduct. *Id.* at 468. A claim or statement is material if it influenced or had the potential to influence the decision-making body to which it was addressed. *Id.* at 468.

The FCA was not designed to punish every type of fraud committed upon the government. *United States v. McNinch*, 356 U.S. 595, 599 (1958). Rather, for liability to attach, the false statement or conduct must have been made in relation to the presentation of a claim for payment. *Longhi*, 575 F.3d at 467. Courts have interpreted this definition broadly to cover, for instance, the submission of claims that do not necessarily contain a false statement therein, but where the right to assert the claim or benefit was attained through a contract or certification for a government program that was obtained or induced by means of false statement or fraudulent conduct. *See, e.g.*, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785–86 (4th Cir. 1999) (citing S. Rep. No. 99-345 at 9 (1986)). These types of false claims are referred to as false certification and fraud-in-the-inducement cases.

False certification cases include situations in which defendants falsely certify that they are in compliance with certain pre-conditions or qualifications required by a

government program when, in actuality, they are not. *Id.* at 786–87.   Liability in a false

certification case attaches if compliance with a statute or regulation was a prerequisite to

obtaining a benefit, and the defendant falsely certified such compliance. *See, e.g., United

States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.

1997).

Fraud-in-the-inducement cases involve claims submitted under a contract that was

obtained through false statements or fraud.  These cases commonly include some form of

bid-rigging. *See, e.g., United States ex rel. Marcus v. Hess*, 317 U.S. 537, 539 n. 1

(1943); *United States ex rel. Laird v. Lockheed Martin Eng'g & Science Servs. Co.*, 491

F.3d 254, 259 (5th Cir. 2007); *United States ex rel. Willard v. Humana Health Plan of

Texas, Inc.*, 336 F.3d 375, 384 (5th Cir. 2003); *United States ex rel. Longhi v. Lithium

Power Techs., Inc.*, 513 F. Supp. 2d 866, 875 n. 8 (S.D. Tex. 2007).  In *Hess*, 317 U.S. at

539, n. 1, for instance, a group of electrical contractors engaged in a scheme to increase

the amount of money that the government would pay for a given project by agreeing on

the bids that each would submit beforehand.   The Supreme Court found that the

government was defrauded because it paid more for the work than it would have had

there been free competition in an open market. *Id.*

Finally, even if the allegations state a plausible claim under the FCA, Rule 9(b)

requires that fraud be plead with particularity.  This requirement is relaxed, however, in

FCA cases where the fraud consisted of numerous acts that occurred over an extended

period of time, as alleged in the case at hand. *See Grubbs*, 565 F.3d at 186; *United States

*ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 780 (S.D. Tex. 2010). In such cases, the relator must allege particular details of the scheme to submit false claims paired with reliable indicia that lead to a strong inference that false claims were actually submitted. *Grubbs*, 565 F.3d at 186.

In the end, the Court concludes that Relator's allegations of bid tampering, gold plating, and product substitution state plausible causes of action against Defendants under §§ 3729(a)(1) and (2) of the FCA and do so with sufficient particularity to satisfy Rule 9(b)'s heightened pleading requirements in the context of an FCA case. Each alleged scheme and the factual allegations relating to that scheme are discussed in detail below.

      a.     <u>Bid Rigging</u>

Relator alleges that Defendants engaged in an ongoing, complex scheme of bid tampering designed to unfairly eliminate other competitors from the bidding process and improperly influence and manipulate the school districts and libraries into adopting Defendants' technology plans and selecting Defendants as the lowest responsible bidders. Relator alleges that, as a result of this manipulation, the claims the schools and libraries submitted to the USAC for payment of funds were false or fraudulent. Relator describes several strategies that Defendants used to manipulate the bidding process in order to make the selection of their bids all but guaranteed, to discourage other bidders from applying for projects, to promote the use of Cisco equipment, and to encourage the adoption of Defendants' technology plans, systems, and equipment (much of which was far beyond the school districts' and libraries' reasonable needs). Relator alleges that

Defendants' practices directly contravened FCC regulations designed to ensure a competitive bidding process and reduce costs for the schools and libraries.

Relator generally describes Defendants' bid-rigging scheme as follows: Before projects were opened for public bidding, Defendants worked together with school districts and libraries to assist in the preparation of technology plans, the design of their communications systems, and the writing of their RFPs to be submitted for public bidding in order to exclude other competitors and guarantee approval of Defendants' technology plans, systems, and equipment before the technology plans and RFPs were ever made public. (See general allegations set forth in the FAC at ¶¶ 4.1–4.11.) The following is a summary, but not a complete list, of Relator's particularized, factual allegations regarding Defendants' alleged bid-rigging scheme:

- Defendants coerced schools and libraries—including, but not limited to, the Corpus Christi Independent School District (CCISD), the Robstown Independent School District (RISD), and the Donna Independent School District (DISD)—into including exclusionary language in their RFPs that specified only Cisco equipment to be installed by Cisco Gold Partners (FAC ¶ 4.13);
- Defendants created cookie-cutter RFPs with exclusionary language that were provided to and utilized by school districts and libraries throughout Texas in publicly requesting bids (FAC ¶ 4.13);
- Defendant Cisco had a full-time sales representative, Kurt Sell, who was specifically assigned to visit, coerce, and conspire with the school districts' E-rate technology representatives (FAC ¶ 4.14);
- Defendants offered kickbacks, such as jobs, to technology representatives that worked for the schools and libraries to influence them and obtain their assistance in perpetrating their unlawful scheme (FAC ¶¶ 4.13);
- Kurt Sell convinced the school districts' technology directors that Defendants could legally design their schools' technology infrastructures and help them create and write RFPs in a way that

would eliminate all but Cisco Gold Partners from qualifying for the projects (FAC ¶ 4.15);

- Defendants' employees Kurt Sell and Scott McKay helped school districts design their technology plans and write RFPs that specified only Cisco Gold Partners would be accepted for the projects (FAC ¶ 4.17);

- While working for Defendant Avnet, Relator helped design no less than eight projects for CCISD schools and libraries before any RFPs were made available for public inspection and bidding (FAC ¶ 4.23);

- Defendants corrected RFPs before their submission to the public for bidding to ensure that Defendants would be the lowest responsible bidders (FAC ¶ 4.23);

- Defendants' employees met with representatives of schools and libraries where they dictated the exact Cisco equipment to be purchased according to Defendants' designs and engineering specifications and coerced school technology representatives into using Cisco equipment (FAC ¶ 4.20);

- One such meeting occurred at the CCISD Technology Center on December 9, 2003; another such meeting occurred at CCISD in December 2004 (FAC ¶¶ 4.21 & 4.22);

- On one project, CCISD entered into an agreement with Avnet before the expiration of the mandatory twenty-eight day waiting period following the release of the school district's technology plan and RFP to the public for inspection and bidding (FAC ¶ 4.24);

- On January 28, 2004, Defendants met with Patrick Chapa, technology representative for RISD, at the RISD Technology Offices the day the bids for the RISD project were due to ensure that Defendants had the lowest responsible bid (FAC ¶¶ 4.26–4.29);

- During the meeting, Defendant Avnet and Chapa unsealed a competitor's bid and used a laptop to correct Defendants' bid to make it more appealing than the competitor's bid (FAC ¶¶ 4.26–4.29);

- Defendant Avnet then printed out the corrected bid in the RISD Technology Center Office and submitted the bid to the school district for approval (FAC ¶ 4.29);

- In 2004, while working on the installation of an RISD communications system, Defendant Avnet took expensive batteries and cables that were purchased with E-Rate funds for installation at RISD and placed them in a portable trailer where they would not be found (FAC ¶ 4.30);

- Defendant Avnet used excess cabling from an RISD project to complete a separate, unrelated project (FAC ¶ 4.30);

- The E-Rate funds awarded Defendants on their projects were well beyond what was normal for similar projects at other schools (FAC ¶ 4.19).

Viewing the allegations in the light most favorable to Plaintiff, the Court concludes that the bid rigging scheme described above worked to limit bidding to only those companies designated as Cisco Gold Partners and reduced competition. Moreover, the Court concludes that the conduct alleged constituted a direct violation of FCC regulations, which require that "[a]ll entities participating in the schools and libraries universal service support program must conduct a fair and open competitive bidding process . . . ." 47 C.F.R. § 54.503. The FCC regulations provide an illustrative list of prohibited activities or behavior that undermines a fair and open bidding process. The list includes the following prohibited behavior:

- Applicant for supportive services having a relationship with a service provider that would unfairly influence the outcome of a competition or would furnish the service provider with inside information;
- Someone other than the applicant preparing the RFP; and
- Service provider participating in the bidding process, bid evaluation, or vendor selection in any way.

*Id.* Where the fair and open bidding process envisioned by the Act is compromised, the government expends more money than it would have in a fair and open marketplace; and this constitutes a false or fraudulent claim for payment. *See Hess*, 317 U.S. at 539, n. 1 ("The government was thereby defrauded in that it was compelled to contribute more for the electric work on the projects than it would have been required to pay had there been free competition in the open market.").

The allegations set forth in the FAC do not describe with particularity each allegedly false or fraudulent claim, false record, or statement submitted to obtain payment or approval; nevertheless, the allegations provide specific details of a scheme to subvert the bidding process and provide reliable indicia that lead to a strong inference false claims were actually submitted to the USAC. Accepting as true Relator's allegations of bid rigging, any claims for payment submitted to the USAC more than likely exceeded the value of what the same claims would have been had there been free competition in an open marketplace; consequently, the claims were false or fraudulent. *See id.*

The allegations describe with particularity the who, what, where, and when of several instances in which a false or fraudulent claim, record, or statement was used to obtain approval of a bid or claim submitted by Defendants; for instance, when Defendants designed the CCISD network systems before the RFPs were made public, when Defendants corrected CCISD's RFP to make it more favorable to them, when Defendants opened a competitor's bid at RISD and then fashioned their own bid to make it more competitive, and when Defendants filed a claim for funds to pay for equipment for RISD that Defendants intended to use at another site.

The Court concludes that Relator provided sufficient allegations to establish plausible causes of action for bid rigging against Defendants under §§ 3729(a)(1) and (2) of the FCA. Furthermore, the Court concludes that the bid rigging causes of action were pleaded with sufficient particularity to satisfy Rule 9(b).

b. Gold-Plating

Next, Relator contends that Defendants violated the FCA by encouraging school

districts and libraries to engage in the gold-plating of their RFPs.  Relator alleges that

Defendants encouraged the school districts and libraries to create technology plans and

submit RFPs with substantially more equipment and technology than needed for the

systems' anticipated uses.   The following is a summary of particularized factual

allegations relating to Defendants' alleged gold-plating scheme.

- Defendants used their employees Kurt Sell, Scott McKay, and Relator Shupe to actively sell robust, gold-plated Cisco networks for numerous school districts throughout Texas including, but not limited to, CCISD, RISD, DISD, the Brownsville Independent School District (BISD), the Edgewood Independent School District (EISD), and the Brownsville Public Library (FAC ¶¶ 4.16, 4.26, 4.30, and 4.32–4.41);
- Defendants convinced CCISD to gold-plate its schools' communications systems and install large numbers of drops in each schoolroom that were accompanied by the best and most expensive Cisco switches, to request equipment that far exceeded the technical requirements of the project, to embellish the networks with hi-end technology, and to order unnecessary equipment that sat unused (FAC ¶ 4.25);
- Defendants gold-plated RISD by over-installing cable and providing an unprecedented number of drops per classroom (FAC ¶ 4.30);
- Relator submitted a 2004 equipment list for RISD that shows the over- abundance of materials that Defendant Avnet represented as essential to the project (FAC ¶¶ 4.31–4.32);
- Avnet gold-plated BISD by installing more than $77 million in equipment from 2000 to 2008 to build a lavish network that far exceeded reasonable industry standards and engineering (FAC ¶ 4.33);
- In 2008, BISD petitioned the E-Rate Program to subsidize fifty-nine WS-6512 Cisco Catalyst 6500 Series switches at a cost of $162,844 each, even though the switches list for only $130,000 each (FAC ¶ 4.34);

- One 6500 switch is powerful enough to run an entire small school, but BISD ordered nine for one high school (FAC ¶¶ 4.34–4.35);
- Defendant Avnet installed many unnecessary network drops at the Brownsville Public Library, and from 2003 through 2009, the library made almost $4 million in funding requests (FAC ¶¶ 4.36–4.37);
- At EISD, Avnet installed drops, batteries, equipment, and cabling that were in gross excess of the school district's needs (FAC ¶ 4.39);
- From 1998 through 2005, EISD spent more than $64 million on internal connections, high-end switching components, and other network hardware components that far exceeded its needs (FAC ¶ 4.40).

Defendants argue that Relator cannot make a claim based on gold-plating because, under 47 C.F.R. § 54.508, school districts and libraries are required to submit technology plans for approval prior to posting RFPs.  Defendants argue that assuming the technology plans were approved, the government had knowledge of the type of technology and systems requested; and therefore, Defendants' claims for reimbursement for installing the gold-plated systems could not have been false or fraudulent. (D.E. 47 at 30–31; D.E. 50 at 16–19.)

Relator counters that, merely because an applicant obtains approval from either the state, the USAC, or an independent entity approved by the FCC, it is possible that neither the USAC nor the FCC had knowledge of the gold-plated technology for which the applicant was seeking approval. (D.E. 60 at 20–22; D.E. 61 at 9–11.) Additionally, Relator argues that, even if the government had knowledge of the technology plan, the Fifth Circuit does not recognize a "government knowledge defense" for FCA claims. (D.E. 60 at 22–23; D.E. 61 at 9–11.)

The Fifth Circuit has not adopted the broad "government knowledge defense" set forth by the Seventh Circuit in *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542 (7th Cir. 1999). The Fifth Circuit does, however, recognize that, if the course of conduct and exchanges between a claimant and the government indicate that all parties regarded the claims as entitled to be paid, then the claims are not false when submitted. *United States v. Southland Mgmt. Corp.*, 288 F.3d 667, 677 (5th Cir. 2003).

In the case at hand, there are no allegations that Defendants were entitled to payment of their claims. The FAC alleges that the technology plans and RFPs that Defendants helped the school districts prepare were full of unnecessary equipment and requests; that Defendants encouraged the school districts to make such requests through kickbacks and other means; and that some of the equipment requested by the school districts was looted by Defendants instead of being installed. The fact that the technology plans were approved by someone in the government does not absolve Defendants of liability because the records contained requests for unnecessary equipment, as well as for equipment that was never installed and looted by Defendants.

Accepting the above allegations regarding the alleged gold-plating scheme as true, the Court concludes that Relator has stated a plausible claim for relief under §§ 3729(a)(1) and (2) of the FCA and that the causes were stated with sufficient particularity to satisfy Rule 9(b)'s heightened pleading requirements as applied in the context of an FCA case.

c.    Substitution

Relator further asserts that Defendants sold and installed VoIP (Voice over IP) equipment to schools and libraries even though, at the time the claims were submitted, such equipment was ineligible for funding under the E-Rate program. (FAC ¶ 4.18.)  In order to get the VoIP equipment approved, Defendants characterized the equipment as an eligible PBX system. (FAC ¶ 4.18.)  In particular, the Hidalgo, Rio Hondo, Progreso, and Pharr-San Juan Alamo Independent School Districts are alleged to have submitted Form 470s asking for telephone upgrades and requesting VoIP quotes on equipment not discounted by the E-Rate Program at that time. (FAC ¶¶ 4.54–4.56.)    Defendants allegedly instructed the school districts to circumvent this limitation by labeling the requests as E-rate eligible PBX systems. (FAC ¶¶ 4.54–4.56.)  Defendants Cisco and Avnet then sold and installed the ineligible VoIP equipment under the guise of an eligible PBX system. (FAC ¶ 6.2.)

Defendants argue that Relator's allegations of substitution are insufficient to state a cause of action under §§ 3729(a)(1) and (2) of the FCA.  Defendants argue that Relator failed to state his claims with sufficient particularity as required by Rule 9(b). Defendants argue that the FAC refers to conversations between Defendants and the school districts regarding the installation of VoIP systems in a conclusory manner without identifying who was involved in the conversations or when and where the conversations took place; that the FAC fails to identify the specific E-rate program rules

or regulations that were allegedly violated; and that the FAC fails to identify any false statements that were made by Defendants. (D.E. 47 at 31–33; D.E. 50 at 19.)

The Court concludes that Relator pleaded facts with sufficient particularity in relation to the alleged substitution scheme to state plausible causes of action against Defendants under §§ 3729(a)(1) and (2) of the FCA and satisfy the heightened pleading requirements of Rule 9(b). The alleged substitution scheme occurred over an extended period of time and involved numerous false records and submissions by various school districts. Rule 9(b)'s pleading requirements are therefore relaxed. *See Grubbs*, 565 F.3d at 186; *Medtronic*, 747 F. Supp. 2d at 780. To survive Defendants' motions to dismiss, the FAC must allege particular details of the scheme to submit false claims paired with reliable indicia that lead to a strong inference that false claims were actually submitted. *Id.*

Under the FCA, it is not necessary that Relator identify specific false statements by Defendants. For Defendants to be held liable, it is only necessary that they knowingly caused to be made or used a materially false record or statement. *See United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (concluding that the FCA applies to anyone who knowingly assists in causing the government to pay claims grounded in fraud). The alleged false statements at issue are the Form 470s requesting bids for VoIP systems labeled under the guise of an E-Rate eligible PBX system. Defendants are alleged to have caused the false statements by instructing the school districts on how to circumvent equipment limitations imposed by the E-Rate

Program by mislabeling the requests as E-Rate covered equipment. Relator is not required to identify any materially false statement by Defendants because it is the Form 470s that contained the materially false statements, and Defendants are alleged to have assisted in or caused these false statements to be made. Similarly, it is not necessary to identify the who, what, when, and where of the conversations in which Defendants instructed the school districts on how to perpetrate the alleged fraud, as it is not the conversations that are alleged to be fraudulent.

Relator specifically identified several of the allegedly false or fraudulent Form 470s by their unique identification numbers; he identified with particularity the alleged false statements the forms contained; he described, in detail, the scheme by which Defendants caused the allegedly false Form 470s to be submitted for public bidding; he alleged that Defendants then sold and installed the ineligible VoIP equipment; and he alleged that Defendants caused the false statements to be made in order to get fraudulent claims paid or approved under the E-Rate Program. (FAC ¶¶ 4.18, 4.54–4.56, and 6.2.) The fact that the FAC failed to allege specifics regarding the conversations or the E-Rate regulations does not defeat Relator's claim. Rule 9(b) is not a pleading straightjacket; rather, it is context specific, and a certain level of flexibility must be permitted in order to effectuate the remedial purpose of the FCA. *Grubbs*, 565 F.3d at 190.

The Court concludes that Relator's allegations of product substitution state a plausible claim for relief under §§ 3729(a)(1) and (2) of the FCA; that the FAC stated the claims with sufficient particularity to satisfy Rule 9(b)'s heightened pleading standard in

the context of an FCA case; and that the factual allegations provide reliable indicia that Defendants caused to be presented false or fraudulent records for the purpose of obtaining the payment or approval of a claim. However, the substitution violations may be barred by the FCA's statute of limitations. It appears the claims were all made in 2003, prior to the January 8, 2004 cutoff.

### 3. *Relator's Conspiracy Allegations Are Stated with Sufficient Particularity*

Defendants argue that Relator failed to plead with sufficient particularity facts setting forth a cause of action for conspiracy to violate the FCA as prohibited by § 3729(a)(3) of the Act. (D.E. 47 at 34–35; D.E. 50 at 26; D.E. 51-1 at 40–42.) Relator contends that he has alleged both the existence of an unlawful agreement as well as multiple acts by Defendants performed in furtherance thereof with sufficient particularity to survive Defendants' motions to dismiss. (D.E. 59 at 28; D.E. 60 at 24–25; D.E. 61 at 16–17.)

In order to plead a cause of action for conspiracy under § 3729(a)(3) of the FCA, a relator must allege (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by the Government, and (2) at least one act performed in furtherance of that agreement. *Grubbs*, 565 F.3d at 193 (citing *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008)). A relator alleging a conspiracy to commit fraud must plead with particularity the conspiracy as well as the overt acts. *Id.* (citing *FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1097 (D.C. Cir. 2008)). Nevertheless, as with claims under §§ 3729(a)(1) and (2) of the FCA, the

fraud pleading requirements are relaxed for FCA claims; in this context, it is sufficient that the allegations provide specific details of the conspiracy and provide reliable indicia that false claims were actually submitted. *Id.*

Relator alleges the existence of an agreement by Defendants to violate the FCA and engage in the following conduct proscribed by the Act: to submit false or fraudulent claims for reimbursement from the United States for monies to which Defendants were not entitled; to tamper with the bidding process and have themselves falsely named as the lowest responsible bidders on numerous school district and library projects; to falsely claim reimbursement for high-end equipment and excessive materials that exceeded the needs of the projects; and to knowingly abuse the E-Rate Program and create government waste for their own personal profit. (FAC ¶¶ 2.6 and 7.2.)

Relator alleges the following overt acts that were taken in furtherance of the Defendants' alleged conspiracy to violate the FCA: Defendants' employees Kurt Sell, Scott McKay, and Relator Shupe worked together to sell, design, and create robust, gold-plated Cisco networks for the named school districts (FAC ¶¶ 4.16 and 4.17); Defendants and their employees met with representatives from the school districts before RFPs for projects were ever made public to help the school districts design their technology plans, to prepare RFPs that favored Defendants and their equipment, and to correct the RFPs to make Defendants appear as the lowest responsible bidder (FAC ¶ 4.8, 4.23); Defendants conducted pre-bid conferences (including one on December 9, 2003 and another in December 2004) to direct the school districts toward choosing Cisco equipment provided

by Cisco Gold Partners, to deny other vendors access to the school districts' representatives, to prevent vendors from sharing their competing plans and equipment, and to strategically eliminate competitors from participating in the bidding process (FAC ¶¶ 4.3, 4.21–4.24); Defendants' included in the RFPs they drafted for the school districts and libraries cookie-cutter language that prevented outsiders from competing for the projects by requiring any vendor submitting a bid to be a Cisco Gold Partner (FAC ¶¶ 4.3, 4.9, 4.13, 4.17, 4.32); and Defendants gave kickbacks to school district employees, including a job offer to Patrick Chapa of RISD, to obtain their assistance in defrauding the government. (FAC ¶ 4.30.)

Based upon the above-described allegations, which represent a sampling of the FAC's allegations, and viewing these allegations in the light most favorable to Plaintiff, the Court concludes that Relator pleaded with sufficient particularity facts setting forth a cause of action for conspiracy to violate the FCA. The Court further concludes that there are sufficient details to satisfy Rule 9(b)'s heightened pleading requirements in the context of an FCA claim. Given the scope and complexity of the conspiracy alleged, it would be impossible to allege with particularity each and every act taken in furtherance of the conspiracy.

    *4.    Relator States Causes of Action Against Defendant Cisco*

Defendant Cisco argues that Relator failed to identify, and cannot identify, any instance in which Cisco made a false claim against the government in violation of § 3729(a)(1) or a false statement under § 3729(a)(2); that Relator failed to plead that

Defendant Cisco acted knowingly; that Relator failed to plead materiality; and that Relator failed to plead that Cisco caused the government to pay out money. (D.E. 50 at 12–22.)

The fact that Relator failed to allege that Cisco filed a claim or directly sought reimbursement from the government is not dispositive. The FCA applies to anyone who knowingly assists in causing the government to pay claims grounded in fraud, without regard to whether that person has direct contractual relations with the government. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (" 'Thus, a person need not be the one who actually submitted the claim forms in order to be liable.' " (quoting *United States v. Mackby*, 261 F.3d 812, 827 (9th Cir. 2001))). For Defendant Cisco to have acted knowingly, it must have had actual knowledge of the falsity of the statement or conduct, acted with deliberate ignorance to the truth or falsity of the statement or conduct, or acted with reckless disregard of the truth or falsity of the statement or conduct. *Longhi*, 575 F.3d at 468. A claim or statement is material if it influenced or had the potential to influence the decision-making body to which it was addressed. *Id.*

Relator alleges that Cisco had a full time sales representative, Kurt Sell, who was assigned to visit, coerce, and conspire with the schools E-Rate representatives. (FAC ¶ 4.14.) Relator alleges that Kurt Sell helped design technology plans and prepare RFPs for the school districts named in the FAC, which is contrary to FCC regulations. (FAC ¶ 4.17.) Relator alleges that Defendants used Cisco employee Kurt Sell and others to sell,

create, and profit from robust, gold-plated Cisco networks for the school districts and libraries. (FAC ¶ 4.16.)  These networks were allegedly sold to CCISD, RISD, DISD, BISD, EISD, and the Brownsville Public Library, among others. (FAC ¶¶ 4.16, 4.26, 4.30, and 4.32–4.41.)   Cisco's employees Brandon Bonar and Jonathan Klossner allegedly held a meeting on December 9, 2003 at the Corpus Christi District Technology Center to dictate exact Cisco equipment to be purchased. (FAC ¶¶ 4.20 and 4.21.)  A similar meeting is alleged to have been conducted in December 2004. (FAC ¶ 4.22.)

Viewing the above allegations in the light most favorable to Plaintiff, the Court concludes that Relator pleaded with sufficient particularity facts demonstrating that Cisco knowingly made, used, or caused to be made materially false or fraudulent statements that assisted in causing the government to pay or approve false or fraudulent claims.  The FAC alleges that Defendant Cisco had specific employees who were assigned to visit, coerce, and conspire with the schools' E-Rate representatives to sell them on unnecessarily robust, gold-plated networks that exclusively used Cisco equipment installed by Cisco Gold Partners.  Any claims for reimbursement on these projects may be considered false or fraudulent because the value of the claims exceeded what they would have been in an open marketplace. *See Hess*, 317 U.S. at 539, n. 1.   The allegations demonstrate that Cisco knowingly assisted in the making of these claims; and therefore, the FAC states plausible causes of action under the FCA against Defendant Cisco.

5. *Relator Fails to State a Cause of Action Against Defendant Calence*

Calence argues that Relator cannot state a claim for relief against it for conduct that occurred before July 14, 2005 because it did not exist as a legal entity prior to that date. (D.E. 51-1 at 29–30.)   Relator did not address this argument in his response. Accordingly, all claims against Calence based on events occurring prior to July 14, 2005 are dismissed.

Calence additionally argues that the FAC fails to satisfy Rule 9(b)'s heightened pleading requirements because it lumps all Defendants together as a group and fails to allege that Calence specifically engaged in any conduct that violated the FCA. (D.E. 51-1 at 31–32.) Relator argues that Defendants are interrelated and acted together, and the fact that the FAC refers to Defendants collectively is not sufficient grounds for dismissal. (D.E. 59 at 21.)

The FAC frequently refers to Defendants collectively.  In the context of the fraud scheme detailed in the FAC, this type of pleading is not wholly unavoidable. *See United States ex rel. Tucker v. Christus Health*, 2012 WL 5351212, at *4 (S.D. Tex. Oct. 23, 2012) ("The allegation that Defendants are inter-related and that they acted together does not alone require dismissal under Rule 9(b)."). However, Defendants are entitled to fair notice of the specific claims against them. *See Grubbs*, 565 F.3d at 190; *United States v. BNP Paribas SA*, 884 F. Supp. 2d 589, 614 (S.D. Tex. 2012); *United States ex rel. Barrett v. Johnson Controls, Inc.*, 3:01-CV-1641-M, 2003 WL 21500400 (N.D. Tex. Apr.

9, 2003) ("Allegations that lump all defendants together, failing to segregate the alleged wrongdoing of one from those of another, do not satisfy the requirements of Rule 9(b).").

The FAC describes with particularity specific instances in which Cisco and Avnet acted together or independently to carry out the alleged fraudulent schemes detailed therein.   Calence, however, is referred to only in conjunction with Avnet ("Avnet/Calence"), as if the two companies constituted a single entity. (See, e.g., FAC ¶¶ 4.1 and 4.2.)   Defendant Calence manages Defendant Avnet's data and voice network, and Defendant Avnet's networking services team is part of Defendant Calence. (FAC ¶ 2.7.)   And Defendant Calence was a Cisco Gold Partner. (FAC ¶ 4.13.)

These allegations fail to allege with sufficient particularity Defendant Calence's participation in the alleged scheme.   Moreover, the fact that Defendant Calence worked with Defendant Avnet and may have benefited from the alleged fraud does not demonstrate sufficient interrelatedness to hold Defendant Calence liable for Defendant Avnet's actions.   Relator's allegations against Defendant Calence are insufficient to survive Rule 9(b)'s heightened pleading requirements, and Relator's claims against Defendant Calence are dismissed.   The Court does, however, grant Relator leave to amend his complaint to provide more specific allegations against Defendant Calence. *See United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010) (" 'A district court should 'freely give leave' to amend a complaint 'when justice so requires.' " (quoting FED. R. CIV. P. 15(a)(2))).

## CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss (D.E. 47, 50, 51) are GRANTED IN PART and DENIED IN PART. Any false claims allegedly made prior to January 8, 2004 are barred by the applicable statute of limitations. Relator's claims against Defendant Calence are dismissed. Relator may proceed on his remaining FCA claims. Relator is granted leave to amend the FAC with regard to his claims against Defendant Calence. The deadline to amend the FAC is May 27, 2013.

ORDERED this 13th day of May, 2013.

Nelva Gonzales Ramos
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE